## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHMOND GLOBAL COMPASS FUND MANAGEMENT, LP; RICHMOND GLOBAL COMPASS FUND MANAGEMENT GP, LLC; RICHMOND GLOBAL COMPASS CAPITAL GP, LLC; and PETER KELLNER, <br><br> Plaintiffs, <br><br> v. <br><br> NOVARTIS INTERNATIONAL AG, MARK DIERINGER, GRW AG, and GARY JOHNSTON, <br><br> Defendants. | Index No. _____ <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiffs Richmond Global Compass Fund Management LP; Richmond Global Compass Fund Management GP, LLC; Richmond Global Compass Capital GP, LLC; and Peter Kellner (together, "Plaintiffs"), by their undersigned attorneys, allege upon knowledge as to themselves and their conduct and upon information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1.      This case arises from a calculated scheme by Novartis International AG ("Novartis"), Novartis's former Head of Alternative Investments, Mark Dieringer, and Dieringer's longtime personal friend and business associate Gary Johnston, to orchestrate a plot to steal Plaintiffs' innovative hedge fund strategy after failing to invest in that strategy through legitimate means.

2.      As described more fully below, in 2016, plaintiff Peter Kellner founded an investment management firm, Richmond Global Compass Fund Management LP ("Compass

Management") to manage a "macro" investment strategy fund,[1] called Richmond Global Compass Capital LP (the "Fund" or the "Compass Fund").[2]  Richmond Global Compass Fund Management GP, LLC ("Compass General Partner") served as the general partner of Compass Management, and Richmond Global Compass Capital GP, LLC ("Compass GP LLC," and together with Compass Management and Compass General Partner, "Compass") served as a general partner of the Compass Fund.[3]

3.      The Compass Fund was established to combine a macro strategy with investment strategies incorporating environmental, social, and governance ("ESG") standards[4]—a cutting-edge investment strategy where the Compass Fund would be the first or among the first of its kind.

4.      Compass Management began trading in June 2017 with Mr. Kellner serving as CEO and Decio Nascimento serving as Chief Investment Officer ("CIO").

5.      Mr. Kellner invested considerable time and resources to develop Compass's investment strategy and position the Fund for success.  He seeded the Fund with millions of dollars of his own money and devoted countless hours to marketing Compass's unique investment strategy to potential investors.  Mr. Kellner also poured his own money and efforts into building the back office and infrastructure of the new fund, including by hiring Frank Jones II to serve as Compass's Vice President of Operations, and Sean Jussen to serve as Compass's Risk Manager.

---

[1] A "macro" strategy investment fund bases its holdings primarily on the overall economic and political views of various countries or their macroeconomic principles.

[2] Compass Management was originally known as Richmond Global Values Fund Management LP and the Compass Fund was originally known as Richmond Global Values Fund LP.

[3] The General Partner was originally known as Richmond Global Values Fund Management GP, LLC.

[4] "Sustainability" is another term for these standards and is used interchangeably with "ESG."

6.      By early 2019, it was clear that Mr. Kellner's efforts were paying off: Compass's investment returns were extremely strong despite the prevailing low-interest rate environment (which is typically unfavorable for macro funds).  These strong returns – coupled with Compass's unique investment strategy – were beginning to attract the attention of significant institutional investors.  One such investor was the pension fund of the pharmaceutical giant Novartis, which invests over $16 billion in assets on behalf of over 31,000 of the company's retired workers.

7.      In May and June 2019, Mr. Kellner had multiple in-person meetings with Novartis, represented by Dieringer, regarding the Compass investment strategy and a potential investment by Novartis in the Fund.  These meetings between Compass and Novartis were facilitated by Johnston, a long-time friend and business associate of Dieringer, through Johnston's company, GRW, a third-party marketer of investment funds based in Switzerland.

8.      Following these meetings, Dieringer requested due diligence information from Compass, which was promptly provided by Mr. Kellner.  Dieringer also introduced Mr. Kellner to another significant institutional investor consortium, writing in an email that he had recently told that investor consortium "about my interest in the Compass fund[.]"  It was thus clear to Mr. Kellner that Dieringer was impressed with Compass's strong returns and investment strategy.

9.      Throughout the summer of 2019, Mr. Kellner worked with GRW to try to capitalize on Dieringer's stated "interest" in Compass.  But Mr. Kellner soon became aware of a significant problem: GRW did not have the requisite license under then-operative Swiss law to market the Fund in Switzerland.  For several weeks, Mr. Kellner and GRW – primarily through Johnston – communicated extensively about this regulatory hurdle and what it meant for Compass's relationship with GRW.  By the end of August 2019, Mr. Kellner determined that it would be

prudent to postpone entering into a formal engagement agreement with GRW, and discussions regarding Novartis's interest in Compass were put on hold.

10.    Dieringer and Johnston were frustrated.    Dieringer knew that Compass's investment approach was highly desirable for Novartis, given Compass's global macro strategy, ESG-investing focus, and strong returns.    And Johnston knew that Dieringer was extremely interested in having Novartis participate in Compass's investment strategy, which meant that GRW—as the marketer that had made the introduction between Compass and Novartis—stood to make a significant commission if Novartis ultimately decided to invest.

11.    Defendants thus conspired to reap the benefits of Compass's investment strategy through illicit means, by inducing Nascimento to deliver the strategy—and the trade secrets underlying that strategy—to Novartis through a new fund that Novartis would effectively control through a $100 million "sweetheart" investment.

12.    Dieringer and Johnston knew full well that Nascimento was an officer of Compass, with attendant fiduciary duties.    Nascimento was present – in his capacity as CIO of Compass – at one of the meetings between Mr. Kellner and Dieringer in the summer of 2019.    Dieringer had also received documents from Mr. Kellner identifying Nascimento as Compass's CIO as part of Novartis's due diligence inquiries into Compass around the same time.    And as decades-long veterans of the hedge fund industry, Dieringer and Johnston knew that a fiduciary like Nascimento was not free to compete against his current fund while still employed there.    But that did not stop Dieringer and Johnston from engaging in a months-long conspiracy to defraud Mr. Kellner and undermine Compass.

13.    After an initial meeting between Nascimento and Johnston in London in September 2019, the conspiracy began in earnest on January 14, 2020, when Nascimento secretly met with

4

Dieringer and Johnston at Novartis's Basel headquarters. At this meeting, Dieringer indicated to Nascimento that he could arrange for the Novartis pension fund to commit up to $100 million in capital for Nascimento to manage using Compass's investment strategy—provided that Nascimento managed this capital in a *new* hedge fund. Dieringer's message was clear: he wanted the Compass strategy for Novartis, but only if Mr. Kellner was cut out of the picture entirely.

14.     To effectuate the plan, Dieringer and Johnston agreed to secretly work with Nascimento on building his new fund while Nascimento was still employed by Compass. By remaining at Compass (as opposed to immediately quitting and starting his own fund), Nascimento could continue receiving a salary from Compass and have unfettered access to Compass's trade secrets and confidential information, which Defendants directed Nascimento to unlawfully steal from Compass to aid in setting up his new fund in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. ("DTSA").

15.     In the months following the January 2020 meeting, Dieringer and Johnston, on behalf of Novartis and GRW, respectively, worked hand-in-hand with Nascimento on Nascimento's formation of an ESG-focused global macro fund (*i.e.*, the same investment strategy utilized by Compass) and orchestrating Novartis's substantial investment in that fund. For example, within days of the January 14, 2020 meeting, Dieringer—through Johnston—sent a template investment agreement to Nascimento for Nascimento to review and return. When Nascimento returned the agreement with his comments—again, through Johnston—Johnston confirmed that the majority of Nascimento's suggested changes were acceptable to Dieringer.

16.     Defendants also had help from other then-current employees of Compass, Jones and Jussen, who were promised high-level roles at the new fund by Nascimento. These Compass employees were instrumental in getting Nascimento's new fund off the ground while still

collecting paychecks from Plaintiffs.  Dieringer and Johnston were aware that Nascimento had solicited Jones and Jussen to work at his new fund while all three were still employed with Plaintiffs.  Indeed, Jones was present at the seminal January 2020 meeting in Switzerland at which Defendants reached their conspiratorial agreement, and Jones emailed directly with Johnston and Dieringer in the months that followed.  Jussen also played an instrumental role in the Defendants' conspiracy and was a party to a number of key communications with Defendants.

17.    By the end of April 2020, discussions between Nascimento, Dieringer, and Johnston progressed to the point where Novartis indicated to Nascimento that it would be issuing a formal request for proposal ("RFP") to Nascimento's new fund.  Less than a week later, Nascimento told Mr. Kellner that he intended to leave Compass unless Mr. Kellner radically altered the terms of his employment on terms more favorable to Nascimento (which Mr. Kellner declined to do).  This was a ruse; Nascimento merely wanted to make it look like it was Mr. Kellner who was the one who decided to part ways.

18.    As Johnson and Dieringer were aware, at no time did Nascimento tell Mr. Kellner that he had been working for months with Defendants on establishing a new hedge fund that would utilize the same investment strategy as Compass.  He did not tell Mr. Kellner that his new fund already had a commitment for a $100 million seed investment from Novartis, orchestrated by Dieringer and facilitated by Johnston.  And he did not tell Mr. Kellner that Jones or Jussen would be joining him at that new fund within a matter of weeks (nor did Jones or Jussen, for that matter).

19.    By May 4, 2020—the same day Nascimento purported to quit Compass—Novartis issued the RFP, which was directed to "Richmond Strategy (new fund to be named)," making clear Novartis knew it was funding a carbon copy of Compass.

20.     Less than one month later, Nascimento filed the paperwork to legally form his own competitor investment fund complex, Norbury Partners.[5]  But in reality, by that point, Nascimento had already formed his hedge fund—and had begun competing with Compass for investors—months earlier, thanks to Defendants' illicit and instrumental assistance.

21.     On or around October 1, 2020, Norbury received a $60 million investment from Novartis.  By February 2021, Novartis had invested an additional $40 million in Norbury, bringing Novartis's total investment in Nascimento's fund to $100 million—the exact amount that Dieringer committed to investing at the January 2020 meeting.

22.     Nascimento breached his fiduciary duties to Compass[6] by competing with Compass while still an officer of Compass, using Compass's resources to do so, and also by failing to disclose to Compass (i) the establishment of his new fund during the time of his employment with Compass, (ii) his solicitation of an investment from Novartis for the fund, and (iii) his recruitment and hiring of Jones and Jussen to work at the new fund. Nascimento also affirmatively misrepresented to Mr. Kellner the nature of the work he was doing between January and May 2020 (building his own fund while purporting to work for Plaintiffs) and the purpose of his trips to

---

[5] The Norbury Partners fund complex consists of Norbury Partners LP, Norbury Partners Fund LP, Norbury Partners Fund Ltd., Norbury Partners International Fund LP, and Norbury Capital Advisors GP LLC (together, "Norbury").

[6] Nascimento's breach of fiduciary duty (among other wrongful conduct) is the subject of another lawsuit brought by Mr. Kellner and certain Compass entities pending in the Commercial Division of the New York Supreme Court, New York County, captioned *Richmond Global Compass Fund Management, GP, LLC v. Nascimento*, Index No. 654190/2021 (the "State Court Action").  At the time the State Court Action was filed, however, Plaintiffs were unaware of the role that Defendants played in Nascimento's wrongful conduct.  It was only through discovery in the State Court Action that Plaintiffs learned that (i) Nascimento's flagrant breach of fiduciary duties was aided and abetted by – and indeed, only made possible by – Defendants; (ii) that Defendants had directed the misappropriation of Compass's trade secrets in violation of the DTSA; and (iii) that Defendants had unfairly competed with Compass.

Europe, including failing to disclose the existence of the September 2019 meeting with Johnston and the January 2020 meeting with Dieringer. Rather, Nascimento continued to make Mr. Kellner believe that he was working for Compass (which was paying his salary) while actually devoting his time and attention to building his new competing firm.

23. But this is not a case about one rogue employee. It is about a sophisticated institutional investor that identified a valuable investment strategy, failed to acquire it legitimately, and then orchestrated an elaborate conspiracy to steal it. Indeed, Defendants did more than aid and abet Nascimento's breach of fiduciary duty. Without Dieringer (working on behalf of Novartis) and Johnston (working on behalf of GRW), Nascimento would never have been able to form his competing fund.

24. Novartis benefitted greatly from the illicit conspiracy. As the first investor in Norbury, Novartis received a sweetheart deal from Norbury, with extremely favorable economic terms, key consent rights, and other benefits not available to later investors in the fund. And for its efforts, GRW was made a "Special Member" of the limited liability corporation that serves as the general partner to the Norbury investment funds, thereby benefitting Johnston by virtue of the participation of Novartis and Dieringer.

25. Defendants' wrongful conduct directly caused the demise of Plaintiffs' investment fund, resulting in substantial damages to Plaintiffs. But Dieringer did not stop there—he also engaged in a campaign of defamation against Mr. Kellner.

26. Plaintiffs thus bring this action asserting claims against Defendants for aiding and abetting Nascimento's breach of fiduciary duty, for violations of the DTSA, and for unfair competition.

8

## PARTIES

27.     Plaintiff Richmond Global Compass Fund Management LP ("Compass Management") is the investment manager to the Compass Fund.  Compass Management is a Delaware limited partnership with its principal place of business located in New York, New York.

28.     Plaintiff Richmond Global Compass Fund Management GP, LLC (the "Compass General Partner") serves as the general partner of Compass Management.  Compass General Partner is a Delaware limited liability company with its principal place of business located in New York, New York.

29.     Plaintiff Richmond Global Compass Capital GP, LLC ("Compass GP LLC") serves as the general partner of the Compass Fund.  Compass GP LLC is a Delaware limited liability company with its principal place of business located in New York, New York.

30.     Plaintiff Peter Kellner is the Chairman and Chief Executive Officer of Compass Management.  Mr. Kellner currently resides in Boston, Massachusetts.  During the time period relevant to this litigation, Mr. Kellner resided in New York, New York.

31.     Defendant Novartis International AG is a multinational pharmaceutical company with its principal place of business in Basel, Switzerland and with other offices located throughout the United States, including New York.  Novartis had over $50 billion in annual revenue in 2024.

32.     Defendant Mark Dieringer is a citizen of Switzerland. At all times relevant to the events and transactions described herein, Dieringer served as the Head of Alternative Investments and External Mandates of Novartis, where he was responsible for overseeing the $15.4 billion Novartis pension fund's hedge fund, infrastructure, equity, and commodities mandates.

33.     Defendant GRW AG is a Swiss company with its principal place of business in Switzerland that markets investment funds to potential institutional investors.

34.     Defendant Gary Johnston is a citizen of Switzerland. At all times relevant to the events and transactions described herein, Johnston was a managing partner of GRW.

35.     Non-party Decio Nascimento is the former Chief Investment Officer for Compass Management and is the Chief Investment Officer and a Founding Partner of Norbury Partners LP. Nascimento resides in Stamford, Connecticut.

36.     Non-party Frank Jones II is the former Vice President of Operations for Compass Management and is a Founding Partner of Norbury Partners LP.  Jones resides and is domiciled in New York, New York.

37.     Non-party Sean Jussen is the former Risk Manager for Compass Management and is a Founding Partner of Norbury Partners LP.  Jussen resides in Connecticut, however, at all times relevant to the events and transactions described herein, Jussen resided and was domiciled in New York, New York.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 in that in that complete diversity exists between Plaintiffs and each of the Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

39.     This Court also has jurisdiction over this action pursuant to the DTSA, 18 U.S.C. §1836(b)(1) because the trade secrets misappropriated by Defendants were related to a product or service used in, or intended for use in, foreign commerce.

40.     This Court has personal jurisdiction over each of the Defendants pursuant to CPLR § 302(a)(1) because, as detailed herein, Defendants, on their own initiative, projected themselves into New York on multiple occasions over a period of months to conduct business related to the establishment of Nascimento's hedge fund and facilitation of Novartis's investment in the same.

41.     This Court also has personal jurisdiction over each of the Defendants under CPLR § 302(a)(2) based on the acts taken by Nascimento, Jones, and Jussen.  Each of Defendants, Nascimento, Jussen, and Jones engaged in a conspiracy to knowingly induce and substantially assist Nascimento's breach of fiduciary duty.  At and immediately following the January 2020 meeting described herein, Dieringer (on behalf of Novartis), Johnston (on behalf of GRW), Nascimento, Jussen, and Jones agreed to facilitate the creation—and funding—of Nascimento's competing hedge fund, as evidenced in several communications between Defendants and Nascimento, Jones, and Jussen, as well as the parties' conduct in the months following the January 2020 meeting.  As detailed herein, Defendants directed and controlled this conspiracy, and Nascimento, Jones, and Jussen intentionally participated in it at Defendants' direction by taking several overt acts in support thereof in New York.

42.     Further, Defendants were aware that their substantial assistance of Nascimento's breach of fiduciary duty would be carried out by Nascimento, Jussen and Jones in New York and have effects in New York.  Defendants knew that Compass was headquartered in New York and that Defendants regularly worked out of Compass's New York office.  Defendants further knew that, through the creation of Nascimento's hedge fund, Compass and Mr. Kellner, based in New York, would be significantly harmed.

43.     The actions taken by Nascimento, Jussen, and Jones were at the direction and for the benefit of (i) Novartis (through Dieringer), which received significant economic benefits as an early investor in Nascimento's fund, and (ii) GRW (through Johnston), which ultimately became a limited partner in Nascimento's fund.

44.     Finally, Nascimento, Jones, and Jussen acted on behalf of Defendants, who orchestrated the establishment of Nascimento's fund and Novartis's investment in the same.

45.    This Court also has personal jurisdiction over Novartis and GRW under CPLR § 302(a)(3) because Novartis and GRW committed tortious acts outside New York causing injury within New York, and Novartis and GRW (i) regularly do business in New York, (ii) derive substantial revenue from interstate and international commerce, and (iii) should have reasonably expected their tortious acts to have consequences in New York, where Compass was headquartered.

46.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.  In addition, the principal places of business for Plaintiffs Compass Management, Compass General Partner, and Compass GP LLC are located in this District.

## FACTUAL BACKGROUND

***Peter Kellner founds Compass Management and hires Decio Nascimento to serve as CIO.***

47.    Plaintiff Peter Kellner has been an active impact investor in environmental and social causes through venture capital for twenty-five years.  He received his undergraduate degree from Princeton University, a J.D. from Yale Law School, and an M.B.A. from Harvard Business School.  Mr. Kellner has invested in companies located in five continents, seeding some of the largest platform technology companies located in countries from Brazil to China.  He has a proven record of enterprise creation and fundraising, having personally raised and invested hundreds of millions of dollars on behalf his companies since 1995.

48.    Mr. Kellner began testing ESG investment strategies over a decade ago.  Mr. Kellner first tested the intersection of ESG metrics and public securities in 2007, with a hedge fund based in San Francisco focused on artificial intelligence.  That initial testing, eventually put on pause due to the global financial crisis of 2007–2008, indicated potential correlations between

ESG metrics and the investment performance of public securities.  Mr. Kellner retested his strategy in 2014.

49.     After spending nearly a decade on research and preparation, in 2016, Mr. Kellner founded Compass Management, an investment management firm dedicated to the positive impact of ESG investments on performance and profitability.  Mr. Kellner knew what others would soon come to learn: ESG investing would become increasingly dominant in the twenty-first century.

50.     After a mutual friend introduced them in 2016, Mr. Kellner began discussions with Nascimento regarding Nascimento's potential employment as CIO of Compass.  Although Nascimento had no prior experience with sustainable investing strategies—and indeed had never heard the term "ESG" before discussions with Mr. Kellner—and, as a CIO, did not possess a portable investment track record, Mr. Kellner believed he could help Nascimento develop the skills and expertise necessary while on the job.

51.     Nascimento's employment with Compass began on May 1, 2016, and was memorialized in an employment agreement (the "Nascimento Agreement").  The Nascimento Agreement granted Nascimento an annualized base salary of $300,000 along with the opportunity to be admitted as a limited partner of Compass Management and a non-managing member of Compass General Partner.

52.     The Nascimento Agreement provided that Nascimento's employment as CIO would commence on May 1, 2016, and would continue through the "Admission Date" – *i.e.*, the date that Nascimento became a limited partner of Compass Management and a non-managing member of Compass General Partner.

53.     In May 2017, Compass and Nascimento signed a letter agreement "confirm[ing] that [Nascimento] will continue to be employed as Chief Investment Officer of [Compass

Management] for an additional one-year period, commencing on May 1, 2017," on the same terms as the original Nascimento Agreement.

54.    In June 2017, Compass Management began trading its global macro strategy with a $20 million investment from two funds affiliated with Kellner Capital, a prominent hedge fund founded by Mr. Kellner's father.    From June 2017 to March 1, 2018, these funds were managed pursuant to a "sleeve" arrangement with Kellner Capital, whereby the capital invested by the Kellner Capital entities was maintained in these entities' accounts, but the investment decisions were made by Compass.

55.    On March 1, 2018, Compass formally established the Compass Fund, and the monies managed by Compass Management for the Kellner Capital funds were transferred to this fund.  Mr. Kellner also invested $5 million of his own money in the Compass Fund.

56.    Following the establishment of the standalone fund, Compass Management served as the sub-advisor to the Compass Fund, with Kellner Private Fund Management, LP serving as the investment manager of the Compass Fund.  Pursuant to a sub-advisory agreement, Compass Management had day-to-day responsibility for the investment activities and related operational functions of the Compass Fund.

57.    In April 2018, Compass and Nascimento signed a letter agreement "confirm[ing] that [Nascimento] will continue to be employed as Chief Investment Officer of [Compass Management] for an additional one-year period, commencing on May 1, 2018," on the same terms as the original Nascimento Agreement.

58.    In May 2019, Compass and Nascimento signed a letter agreement "confirm[ing] that [Nascimento] will continue to be employed as Chief Investment Officer of [Compass

14

Management] for an additional one-year period, commencing on May 1, 2019," on the same terms as the original Nascimento Agreement.

59.     As CIO, Nascimento was entrusted with managing the Compass Fund's investments and Compass relied upon Nascimento to manage investments for the benefit of the Compass Fund.

60.     In addition to hiring Nascimento as CIO, Compass and Mr. Kellner supported Nascimento's personal career development and provided network development opportunities. Compass and Mr. Kellner did so because of the long-term value that would accrue to Compass from this diversion of Nascimento's time and energy away from the day-to-day activities of his job with Compass Management.

61.     Beyond passively supporting Nascimento's ambitions, Mr. Kellner took active steps to improve Nascimento's skills and expertise.  Nascimento requested Mr. Kellner's permission to enroll in Yale University's executive MBA program, suggesting the credential would benefit Compass.  At Mr. Kellner's request, Dan Esty, a Compass Advisory Board member and a professor of environmental law and policy at Yale Law School, supported Nascimento's admission with a letter of recommendation, as did Mr. Kellner himself.

62.     In addition to supporting Nascimento's studies at Yale, Mr. Kellner encouraged Nascimento when he requested to study sustainability for two weeks in London.

63.     Mr. Kellner also devoted considerable time and resources into developing Nascimento's abilities, expertise, and reputation as an ESG investor.

64.     For example, Mr. Kellner made extensive efforts to introduce Nascimento to Mr. Kellner's vast network of investors and professionals.  Mr. Kellner is a board member of multiple technology companies as well as a Member of the Council on Foreign Relations, Pacific Council

15

for International Policy, and International Institute for Strategic Studies.  He is also an Aspen Institute Henry Crown Fellow, Yale University Sterling Fellow, and Young Global Leader at the World Economic Forum. He served as a Trustee of the Allen-Stevenson School in New York City and is a Trustee of America Media | The Jesuit Review, where he co-chairs the Investment Committee.

65.     During the years over which he worked with Mr. Kellner, Nascimento led Mr. Kellner to believe that Nascimento was fully committed to the vision for Compass and its long-term goals.  Nascimento indicated as much in 2018 when he assured Mr. Kellner that, if Nascimento ever decided to resign from Compass, he would work together with Mr. Kellner to identify and interview a replacement CIO.  Thus, Mr. Kellner came to trust Nascimento.  Mr. Kellner frequently referred to Nascimento as his "50-50 partner" in Compass both to other members of the Compass Team as well as to outside investment allocators, and he consulted Nascimento on sensitive and strategic decisions.  Nascimento also publicly referred to himself as a "Partner" and "Co-Founder" of Compass.

***Mr. Kellner builds out the Compass team and positions the Compass Fund for success.***

66.     On July 5, 2017, Compass hired Jussen as its Risk Manager to support Nascimento. Upon the launch of the standalone Compass Fund in March 2018, Jussen became an employee of Kellner Capital as a structural consideration, including so that Compass would have access to certain investment products and trade execution under the Kellner Capital umbrella.  In practice, however, Jussen was a Compass employee, working as an execution trader and risk manager for Compass and being involved in the Compass Fund's day-to-day operations.

67.     On June 17, 2019, Compass hired Jones as its Vice President of Operations to support Mr. Kellner.

68.     Like Nascimento, Jussen and Jones both came to Compass with no prior experience in ESG investing.  Jussen previously worked as an analyst for Eaglevale Partners LP, a hedge fund specializing in macroeconomic bets.  Jones, meanwhile, had no experience with hedge funds or investment management, much less ESG-focused investment management.

69.     Because Jussen lacked experience in ESG investing, Mr. Kellner devoted significant amounts of time to training and credentialing Jussen.  Likewise, although Jones had no trading experience, Mr. Kellner agreed to consider Jones for a trading post once Compass established a three-year track record.

70.     During their employment with Compass, Jones and Jussen worked out of Compass's New York offices.  Nascimento had a hybrid arrangement in which he worked both at his home in Connecticut and, periodically, in Compass's New York office.  Once a week, Nascimento worked from Compass's New York headquarters and joined Mr. Kellner for a standing lunch across the street from the office.  During these lunches, Mr. Kellner and Nascimento spoke about the firm, their families, and life in general.  Nothing in those conversations—or in Nascimento's typically upbeat demeanor—suggested to Mr. Kellner that Nascimento was dedicated to anything other than ensuring the success of the Compass Fund for years to come.

***Mr. Kellner uses his experience, expertise, and connections to set Compass up for success.***

71.     Building a successful hedge fund requires positioning the new business to attract substantial investments from outside investors.

72.     Mr. Kellner's personal and professional networks, as well as his other business pursuits, opened up a number of promising opportunities for Compass.

73.     For example, throughout its existence, Compass was benefitted by its relationship with Kellner Capital.  Through this strategic relationship, Mr. Kellner underwrote Compass's

overhead at full market rates—paying the same rent, equipment costs, and operating fees Kellner Capital itself incurred.

74.    Mr. Kellner also ensured that Compass Management had a robust compliance program (headed up by Kellner Capital's veteran CFO—a 30-year investment industry professional) and an institutional-grade cyber security and back-office platform.

75.    In addition, Mr. Kellner assembled an advisory board for Compass, consisting of four nationally-recognized leaders in sustainable finance: Daniel C. Esty, his former Yale Law professor and frequent collaborator on environmental-policy initiatives; George Serafeim, the Harvard Business School scholar whose pioneering research on material ESG factors helped launch the modern impact-investing field; Bill Drayton, founder and chief executive of Ashoka, a non-profit that finds social entrepreneurs around the world, and Mr. Kellner's mentor for more than three decades; and Dr. Erik Allen, an MIT-trained data scientist who built Compass's ESG machine learning (a branch of artificial intelligence) platform. To honor their commitment, Mr. Kellner held formal quarterly meetings and, when the sessions ran late, concluded the evening with a dinner he and his wife hosted.

76.    Despite the competitive edge it had through its affiliation with Kellner Capital and Mr. Kellner's connections and reputation, in the competitive battle to attract the attention of investors, like any new hedge fund, Compass needed to demonstrate that its investment strategy would achieve an attractive return. Investment advisors acting on behalf of outside investors will generally allocate their funds only to strategies with at least a three-year track record of successful performance.

77.    Demonstrating a successful three-year track record for Compass was especially critical because it was managed day-to-day by Nascimento. Although Nascimento worked under

Mr. Kellner's supervision, Nascimento was an unproven CIO without a portable track record. Marketing a novel investment strategy raised the bar for Compass's success even higher, because it was the first or among the first of its kind.

78.    To further position the Compass Fund for success, Mr. Kellner worked with renowned business and technology experts to develop the ESG machine-learning platform that would support and complement Compass's qualitative considerations of ESG factors in its investment analysis and decisions.  This platform, known as the Compass Materiality Dashboard ("CMD"), was inspired and supported by Professor Serafeim.

***Novartis targets Compass's one-of-a-kind ESG investment strategy.***

79.    After nearly two years of trading the Compass strategy, Compass had built an impressive track record of results.  By May 2019, the Compass Strategy showed an inception to date ("ITD") pro-forma return of 35.9% net of performance and management fees.  Compass was well on its way to achieving a successful three-year track record.

80.    In parallel to the efforts to build a successful three-year track record, Mr. Kellner diligently sought outside investors and was successful in generating interest in Compass.

81.    Attracting outside investors as a new Fund without a full three-year track record was extremely difficult. Mr. Kellner nonetheless continued to pursue opportunities with outside investors, including with the assistance of multiple third-party marketing firms—including GRW, to which Mr. Kellner was introduced through an associate.

82.    At the time of Mr. Kellner's introduction to GRW, Johnston was a managing partner of GRW.  Through his work as a marketer for investment funds, Johnston knew that the pension fund of Novartis was one of the largest European investors in global macro hedge funds

(like Compass).  In addition, Johnston was a personal friend and prior business associate of Dieringer over a 40-year period.

83.     As his title suggests, Dieringer's mandate covered alternative investments for Novartis's $15.4 billion pension fund, which included investments in hedge funds.  Dieringer had a particular interest in hedge funds that utilized global macro strategies and specialized in absolute return strategies.[7]

84.     In May 2019, GRW arranged a meeting with Mr. Kellner and representatives of Novartis, including Dieringer.  At that meeting, Dieringer expressed serious interest in Compass's strategy and returns, and he also was piqued by Compass's integration of ESG into its investment philosophy.  Dieringer indicated that he would be following up with Mr. Kellner for further information on the Compass Fund.

85.     Less than two weeks after their initial meeting, Dieringer emailed Mr. Kellner to request due diligence materials from Compass, including its prospectus, offering memorandum, subscription documents, articles and memorandum of association, and due diligence questionnaire ("DDQ"), as well as contact information for Compass's legal counsel.

86.     Compass promptly provided Dieringer's team with the requested diligence materials, including Compass's DDQ.  The DDQ made clear that Compass's office was in New York City, and that Compass's "investment analysts and trading professionals, as well as its CEO [Mr. Kellner], are located in its office in New York City."

---

[7] An absolute return investment strategy is an approach designed to generate positive returns in any market environment.

87.    In mid-June 2019, both Mr. Kellner and Nascimento attended another meeting with representatives of Novartis in Europe (including Dieringer). Johnston was also present at this meeting.

88.    Shortly after this second meeting, Dieringer made an email introduction between Mr. Kellner and InPact Partners ("InPact"), a consortium of large, international asset owners such as pension funds, insurance companies, family offices, foundations, and endowments. In a July 1, 2019, email, Dieringer wrote to Mr. Kellner introducing him to InPact and noting: "I recently told InPact about my interest in the Compass fund."

89.    Based on his meetings with Novartis, Dieringer's request for due diligence materials, and Dieringer's communication to InPact that expressly indicated Novartis's interest in investing in the Compass Fund, Mr. Kellner was realistically optimistic about the opportunity of securing a significant investment from Novartis in the Compass Fund.

90.    Mindful that GRW had made the introduction to Novartis, Mr. Kellner engaged in numerous discussions with GRW in the summer of 2019 regarding GRW's ability to legally market the Compass Fund in Switzerland under Swiss regulations. While GRW recognized that it could not legally market the Compass *fund* under then-current Swiss law, GRW insisted that it could still introduce the Compass *strategy* to investors like Novartis.

91.    Notwithstanding these representations by GRW, Mr. Kellner ultimately concluded—based on advice from counsel—that it would be prudent to postpone further discussions with GRW until 2020, when the applicable Swiss regulations were scheduled to be relaxed.

***Johnston "lights the spark," encouraging Nascimento to compete with Compass.***

92.    By the end of August 2019, Johnston was unhappy with Mr. Kellner.  Mr. Kellner's decision to put Compass's relationship with GRW on hold until 2020 meant that GRW could not earn any commissions from connecting Compass with potential investors, including Novartis, for (at least) several more months.  But recognizing Novartis's interest in investing in Compass and its cutting-edge strategy, Johnston saw an opportunity.

93.    Johnston knew, from his longstanding relationship with Dieringer as well as Johnston's presence at the meeting between Compass and Novartis earlier in the summer of 2019, that Dieringer was genuinely interested in Compass's investment strategy.  Johnston also knew that Nascimento was the person primarily responsible for implementing and managing that strategy on a day-to-day basis.  Thus, Johnston saw an opportunity to remove Mr. Kellner from the equation, which would allow Johnston to work with Dieringer to deliver the Compass strategy to Novartis and thereby benefit his close personal friend while earning a sizeable commission for GRW.

94.    Accordingly, Johnston arranged to meet with Nascimento and Jones in September 2019, at a time when he knew that Mr. Kellner would not be able to attend.  Before doing so, Johnston sent an email to Mr. Kellner – at Jones' request – indicating that Dieringer "would like to watch the [Compass] portfolio over the next few months to see how it performs[.]"

95.    Nascimento met with Johnston in London on September 11, 2019.  As Nascimento later described in a text message to Johnston, Johnston was "the one lighting the spark" at this meeting, *i.e.*, encouraging Nascimento to cut out Mr. Kellner, take with him the Compass strategy that Novartis wanted to invest in, and form a new competing hedge fund.  Johnston suggested to

Nascimento that, were Nascimento to do that, Johnston would be able to deliver Novartis as the anchor investor in that fund.

96.    At no point did Nascimento disclose to Mr. Kellner— who, through Compass, paid for Nascimento's trip by being misled by Nascimento that it was for the purpose of marketing the Compass Fund—that Nascimento was planning to meet with Johnston, what the purpose of the meeting was, or why Nascimento was taking this meeting with Johnston at a time when he was supposed to be meeting potential Compass investors and promoting the Compass Fund.  Nor did he ever disclose that Johnston was "lighting the spark" at this meeting by encouraging Nascimento to strike out on his own and form a competing hedge fund.

97.    For months, Nascimento brainstormed with Jones and Jussen about how to effectuate Johnston's vision, exchanging text messages in which Nascimento discussed how he could supposedly leave Compass without running afoul of any contractual obligations in his employment agreement.

98.    By early January 2020, Nascimento was ready to take the next step.    At Nascimento's direction, Jones reached out to Johnston to set up another secret meeting—this time, with Dieringer present as well.  They settled on a date of January 14, 2020, and agreed that the meeting would occur at Novartis's campus —exactly where Mr. Kellner had previously met with Dieringer just six months earlier to discuss Novartis's interest in the Compass investment strategy.

99.    Jones confirmed the scheduling of this illicit meeting in a text message to a former Compass employee on January 7, 2020, stating that he had "just got off the phone [with] someone in Switzerland [*i.e.*, Johnston] about an exit for the 3 of us," referring to Nascimento, Jones, and Jussen.

100.    To get Plaintiffs to pay for their trip to Switzerland, Jones told Mr. Kellner that he and Nascimento wanted to travel to Europe to market the Compass Fund's impressive performance to several large European institutional investors.  This was a lie.  In reality, the purpose of this trip was for Nascimento to meet with Dieringer and Johnston to discuss an "exit" from Compass—not to solicit an investment in Compass.

101.    A few days before their trip, Jones sent Mr. Kellner a proposed itinerary, which included a number of scheduled meetings in England and Switzerland, while omitting their planned meeting with Dieringer and Johnston.

102.    In reliance on the false representations by Jones, who was acting to carry out the scheme to the benefit all of the co-conspirators (including Defendants), Plaintiffs expended the resources to enable Nascimento and Jones to attend this meeting.

103.    On January 10, 2020, following a change in the Swiss regulatory regime applicable to the marketing of hedge funds, Mr. Kellner emailed Johnston to explore reopening the relationship between Compass and GRW.  Mr. Kellner noted in the email that Nascimento and Jones were scheduled to be in Switzerland for Compass investor meetings in the coming days "if Novartis and other[s] wish to catch up with us."

104.    In response to Mr. Kellner's email, Johnston—who was planning to attend the secret meeting four days later with Compass's CIO and Dieringer at Novartis's campus—merely stated that GRW had "decided to forgo the opportunity to represent" Compass.  Mr. Kellner was disappointed, but was also confident that Compass would be able to secure external capital (without GRW's help) upon Compass achieving a strong three-year investment track record.

105.    In preparation for their upcoming meeting with Nascimento and Jones, Johnston sent Dieringer an email which attached Compass's monthly newsletter, which showed Compass's strong investment returns over the last several months.

***Dieringer commits Novartis to invest $100 million in Nascimento's new copy-cat fund***.

106.    On January 14, 2020, Nascimento and Jones met with Johnston, Dieringer, and members of Dieringer's team at Novartis's campus in Basel, Switzerland.

107.    At this meeting, Dieringer confirmed that Novartis was interested in investing in the Compass investment strategy, echoing what he had told Mr. Kellner at their meeting months earlier.  But rather than invest in the Compass Fund, *i.e.*, the fund that utilized the Compass strategy, Dieringer told Nascimento that Novartis wanted to invest with Nascimento directly, in a new hedge fund to be formed by Nascimento, but that would still deploy the Compass strategy. More specifically, Dieringer indicated to Nascimento that Novartis would be willing to commit up to $100 million in seed capital in Nascimento's new fund, provided that new fund utilized the exact same investment strategy as Compass.  As part of this plot, at the Defendants' direction, Nascimento (with Jussen and Jones) would build the competing fund while still working for and being paid by Compass, and use and provide to Novartis and GRW Compass's confidential information to do so.

108.    Nascimento and Jones could barely contain their excitement at Dieringer's offer. Within hours of leaving the January 14 meeting, Jones sent a series of text messages to his then-fiancée stating that he and Nascimento were "gonna get $60mm from [Novartis] pretty quickly," and that the $60 million initial commitment would "build[] to $100 pretty quickly."  Jones also wrote, with respect to the expected timeframe for this investment from Novartis, that it would come in approximately "2-3 months maybe sooner… we just need to agree on terms and they

already did the legal work for a diff[erent] fund and we don't hate their terms." Jones also told Jussen about the outcome of this meeting.

109.    At the time, Nascimento believed he was still under contract to serve as Compass's CIO until at least May 1, 2020. Rather than simply quit and start his new fund, however, to benefit all of the Defendants, Nascimento would use the remaining time with Compass to secretly work on his new fund. That way, Nascimento would continue to be paid his yearly salary of $300,000 for another several months; would continue having access to Compass's confidential information and trade secrets (which he would ultimately provide to Defendants at their direction in connection with establishing the new fund); and would continue to be able to work in close proximity to Jones and Jussen as they set out to put the illicit plan into action. In turn, Defendants would benefit because rather than waiting many additional months after Nascimento left Compass and the post-employment non-competition provision under his employment contract expired, Nascimento could begin building the fund immediately, thereby enabling Defendants to profit from the conspiracy much sooner.

110.    Defendants, Nascimento, Jones, and Jussen knew, however, that for such a plan to work, Mr. Kellner would have to be kept entirely in the dark. Thus, Dieringer (on behalf of Novartis), Johnston (on behalf of GRW), Jones, and Jussen agreed to substantially assist Nascimento in this scheme, helping him to conceal (i) the formation of his competing fund to Compass, (ii) the solicitation (and ultimate hiring) of Jones and Jussen to work at that fund; and (iii) Novartis's investment in that fund.

111.    For the next several months, Nascimento embarked on a campaign of carrying out his breaches of fiduciary duty through fraud, lying to Mr. Kellner and pretending that he was continuing to work in the interests of Compass, while actually spending his time and Compass's

money to compete with Compass.  As detailed below, this campaign was only made possible with Defendants' substantial assistance and encouragement.

***Defendants and Nascimento work to effectuate the conspiracy.***

112.    Less than a week after the January 14 meeting in Switzerland, Dieringer began putting his words into action.  On January 18, 2020, Dieringer sent Johnston, for transmission to Nascimento, a copy of a draft investment agreement between Novartis and another global macro hedge fund that Novartis was considering a seed investment in at the time.  This was the "diff[erent] fund" that Jones referenced in his text message above – *i.e.*, the fund that Novartis had "already did the legal work for[.]"

113.    This act by Dieringer, on behalf of Novartis, was an overt act in furtherance of the illicit conspiracy described herein.  Indeed, the draft agreement provided by Dieringer to Nascimento (through Johnston) while Nascimento was still an officer of Compass, was intended to serve as a template to facilitate investment by institutional investors (including Novartis) in Nascimento's soon-to-be-formed new fund.  In fact, several months later, the draft agreement provided by Dieringer ultimately became the foundation of the agreement governing Novartis's investment in Norbury.

114.    Johnston dutifully forwarded Dieringer's draft agreement to Nascimento and Jones on the same day.  In his transmittal email to Nascimento and Jones, Johnston stated that the agreement reflected "***terms broadly as they were described***" – *i.e.*, as discussed during the January 14 meeting.  Johnston also told Nascimento and Jones that the ball was now in their court to begin negotiating with Dieringer: "***I believe it is now your move – to share your numbers with Mark [Dieringer]. Once he is familiar with that we can begin to work on solving for necessary terms everyone would be comfortable with***."

27

115.    A few days later, Nascimento confirmed receipt of the email from Johnston (and accompanying draft agreement): "Just wanted to give you a heads up we are working on this and should have something back to you and Mark [Dieringer] shortly. Extremely excited!"

116.    On February 17, 2020, Johnston emailed Nascimento and Jones to check in on their progress with the draft agreement: "[H]ope all is moving along smoothly. I will see Mark this weekend so would be good to catch up with you before then – give me a shout when you have a minute." Nascimento responded that he had reviewed the draft agreement with counsel, and that "most of the contract is agreeable."

117.    On February 19, 2020, Nascimento sent back to Johnston, for transmission to Dieringer, a marked-up version of the draft agreement, reflecting proposed changes and comments from Nascimento and his counsel, Jeremy Deutsch, then of the law firm Anderson Kill. In his email transmitting the marked-up agreement to Johnston, Nascimento indicated that he had already taken concrete steps towards forming his new fund, noting that he had "spoken to a lawyer on the topic" of where his new fund should be domiciled. Nascimento also made clear in this email that he was taking his orders from Dieringer, noting that he would be ***"happy to set up"*** the fund structure and domicile however Dieringer directed so as "***to be most convenient for Mark [Dieringer],***" underscoring Dieringer's central role in, and direction of, Nascimento's establishment of his competitor fund.

118.    In the same email to Johnston, Nascimento also explained a number of his proposed edits to the template agreement provided by Novartis, including "[c]harging higher fees for the first 2-3 years to help us build the business," "[w]illingness to pay the first six months of management fees on Day 0 to help support startup and launch costs," and "[d]esired capacity rights." Nascimento also memorialized Dieringer's commitment to invest $100 million in his

soon-to-be-formed fund: "***As you might remember, Mark said he would start with an allocation of $60mm and then quickly increase it to $100mm.***"

119.    Less than a week later, Johnston emailed Nascimento, stating that he had spoken to Dieringer "***and by his own words he is 'quite serious' about moving this ahead.***"  Underscoring Dieringer's interest in Compass's unique, ESG-focused investment philosophy, Johnston noted that Dieringer would be "***heavily emphasizing the ESG aspect***" of Nascimento's new fund, which would serve as the "internal 'hook'" for Novartis's interest in the fund.

120.    In the same email, Johnston instructed Nascimento to obtain, and provide to him, due diligence information on his soon-to-be-formed fund, located on Plaintiffs' server in New York City, which Johnston would then provide to Dieringer.  Among other items requested, Johnston specifically asked Nascimento to provide Compass's trade secrets, including how Compass "use[s] ESG in [its] investment process/alpha generation," "gross track record of [Compass]," "pnl attribution,"[8] "[investment] portfolio management/risk parameters," "drawdown guidance (trade & portfolio),"[9] and "general narrative on portfolio construction/approach." Johnston noted in the email that he "assum[ed] you don't have the above materials for the new firm"—underscoring his knowledge that these were materials belonging and pertaining to Compass.

---

[8] In the context of an investment fund, a profit-and-loss ("PNL") attribution is an analysis of a fund's income statement that seeks to tie the daily fluctuation in the value of a portfolio of trades to the root causes of the changes.

[9] A "drawdown" is a peak-to-trough decline in the price of an investment and/or the decline in the value of the fund itself.  In the context of an investment fund, "drawdown guidance" refers to a fund's guidelines for evaluating the potential depth and duration of such declines, enabling a fund's investment manager to make more informed decisions and develop strategies to mitigate risks across multiple types of securities.

121.    Johnston also stated in the same email that Dieringer had approved Nascimento's proposed "3 class structure" for the new fund, and that he and Dieringer had gone through the marked-up contract Nascimento provided and that none of Nascimento's comments to the agreement "were countered out of hand." Johnston also indicated that Dieringer had directed that Nascimento's fund be domiciled in the Cayman Islands, and ended the email by stressing that Dieringer "***wants to make the launch work . . . You provide the info he needs, he does his analysis and prepares the investment case and then we move on to negotiating terms***."

122.    In response to Johnston's urging, Nascimento and Jones began preparing due diligence materials for the new fund, including a pitchbook and due diligence questionnaire, as confirmed in a series of text messages from Jones to a friend in early March: "we're putting together a big presentation for new fund for Novartis . . . making progress . . . we are putting together a big DD [due diligence] package for Novartis."

123.    By March 9, 2020, Nascimento and Jones had prepared the requested due diligence materials and other documentation for their new fund, which they ultimately shared with Johnston, and, later, Novartis, through a secret electronic "data room." As Nascimento wrote in an email to Johnston, the data room contained, among other things, Compass's confidential and trade secret information requested by Johnston a few weeks earlier: "Portfolio Construction and ESG Integration Document," "Gross Track Record," "P&L Attribution," "Risk Parameters," and "Drawdown Guidance."

124.    Notably, Nascimento also emailed the due diligence questionnaire that he and Jones prepared for Novartis to a prominent global macro fund that was a competitor of Compass, stating that it was a "DDQ we did for the pension fund"—*i.e.*, Novartis's pension fund.

125.    On April 14, 2020, Johnston emailed Nascimento to inform him that he had spoken "at length" to Dieringer and that Dieringer and his team "would like to have one final overview of your strategy and approach" in the coming days. Johnston indicated to Nascimento and Jones that, following this call, Novartis would be issuing a formal request for proposal (RFP) and legal due diligence request for Nascimento's new fund.

126.    On or around April 21, 2020, Nascimento, Jones, and Jussen had a Zoom videoconference with Dieringer and two other members of Dieringer's team, Marc Buhlig and Dennis Balan, who were based in Luxembourg. The purpose of the videoconference was to discuss the forthcoming RFP and legal due diligence request – as confirmed by a text message from Jones to a friend a week later: "[We] had an RFP mtg last week . . . waiting on the official proposal."

127.    Following the April 21 call, Jones emailed a link to the secret data room (that Nascimento had previously sent to Johnston) directly to Dieringer, Balan, and Buhlig, affirming that it contained a "repository for documents we are sharing and/or completing as part of the DD [due diligence] process." Jones concluded his email by noting that himself, Nascimento, and Jussen were "look[ing] forward to next steps and are *standing by for further instruction*" from Novartis.

128.    While Nascimento worked with Dieringer and Johnston to establish his competing fund, he (along with Jones and Jussen) also took numerous other steps to ensure a seamless launch of the fund. For example, Jussen began reaching out to firms who specialize in back-office services for start-up hedge funds. By the end of April, Nascimento, Jones, and Jussen had held a call with the firm that would ultimately serve as the new fund's "outsourced CFO," providing accounting, trade reconciliation, and other key services.

129.    Nascimento did not disclose any of these discussions or communications regarding the new fund to Mr. Kellner.  In fact, as planned with Dieringer and Johnston, Nascimento took great pains to conceal these communications from Mr. Kellner, using a personal (non-Compass) email address for all emails regarding the new fund, including the emails with Dieringer and Johnston described herein.

130.    Dieringer and Johnston directed and participated in this subterfuge, as they understood that continuing to mislead Plaintiffs was critical, and knew they were close to their goals: for Novartis, the ability to commit capital to an investment strategy it was eager to participate in; for Dieringer personally, the ability to help his decades-long friend, Johnston; and for Johnston and GRW, the ability to earn the commission that Johnston believed Mr. Kellner had wrongly denied GRW.

***Compass approaches its three-year milestone.***

131.    As of April 2020, amidst market uncertainty caused by the onset of the global COVID-19 pandemic, the Compass Fund's performance showed an outsized return on investment of 30.76% since inception (net of performance and management fees), corresponding to a 9.90% annualized return, far outpacing comparable market indices.

132.    By May 1, 2020, Compass was on the brink of achieving a full three-year track record, and Compass was poised to market its now-proven strategies to the outside investors it had cultivated for years.

133.    This was one reason why Defendants directed that the competitor fund be established immediately after the January 2020 meeting while Nascimento was still an officer of the Plaintiff entities—they needed to ensure that Nascimento was ready to operate his copycat fund before Plaintiffs were poised to market their own three-year track record.

134.    By this time, Defendants were aware that Compass had exceptional investment returns: Compass's track record was included in the diligence package that Dieringer had requested from Mr. Kellner in the summer of 2019.  And to get a more recent update on Compass's performance, Johnston had specifically requested that Nascimento include, in his "data room" intended for Novartis, the "gross track record of RG [Compass]."  Nascimento obliged this request.

135.    In the months leading up to the three-year checkpoint, Mr. Kellner focused his time on raising working capital for Compass General Partner so that Compass would have the resources it needed to market the track record.

136.    Mr. Kellner's efforts were successful.  On May 1, 2020, Compass General Partner received $4 million from investors and had commitments for an additional $4 million by June 1, 2020.

137.    What Mr. Kellner did not know was that, at the same time, Nascimento had been marketing the Compass track record, too, but only for the purpose of obtaining Novartis's investment in his new fund.  As discussed above, Nascimento, at Johnston's request, included in the "data room" for Novartis a copy of Compass's track record.

***Nascimento leaves Compass – without disclosing that he had established his own hedge fund to compete with Compass.***

138.    On Monday, May 4, 2020, Nascimento emailed Mr. Kellner to state that he believed that his employment contract with Compass had expired.  Nascimento indicated to Mr. Kellner that he was planning to leave Compass unless Mr. Kellner agreed to a new arrangement with more favorable terms to Nascimento.

139.    On the very same day that Nascimento sent this email to Mr. Kellner, Marc Buhlig sent two emails to Nascimento, Jones, and Jussen.  Dieringer and Johnston were copied on both

emails. These emails reflected the RFP and legal due diligence request from Novartis that Johnston confirmed would be forthcoming following the April 21 Zoom call.

140. The first email, subject line "***Novartis Request for Proposal for Richmond Strategy (new fund to be named)*** – accelerator share class in USD," indicated that the "***Richmond Strategy (new fund to be named) . . . has been selected for potential investment by Novartis***." The email attached a lengthy questionnaire to be filled out by Nascimento, seeking information on his new fund, and requested completion of the same by July 15, 2020.

141. The second email, subject line "***Novartis legal due diligence – Richmond strategy (new fund to be named) –*** accelerator share class in USD," requested further information on Nascimento's new fund, including a prospectus/offering memorandum, articles and memorandum of association and certificates of good standing, and a marketing presentation.

142. The fact that Novartis issued these requests for the "Richmond Strategy" makes clear that all parties knew that Nascimento's new fund was intended to be a carbon copy of Compass (*i.e.*, Richmond Global Compass) only without Mr. Kellner, just as Defendants had directed.

143. It was no coincidence that Dieringer's team waited two weeks after the April 21, 2020 call before issuing these requests in writing. Dieringer knew that Nascimento was employed as an officer of Compass. Thus, Dieringer's team delayed sending these emails—which explicitly stated that Novartis had "selected for potential investment" Nascimento's fund—until the *very same day* that Nascimento purported to quit his job at Compass.

144. Mr. Kellner was shocked by Nascimento's May 4 email. Nascimento, who had for years represented himself as Mr. Kellner's "Partner" and a "Co-Founder" of Compass, had not previously indicated to Mr. Kellner that he was planning to leave Compass. Mr. Kellner, who was

in the midst of preparing to market Compass's track record, had not addressed with Nascimento entering into a new letter agreement. Accordingly, Mr. Kellner indicated to Nascimento that his assistant would send an amendment to the Nascimento Agreement "as [Mr. Kellner] expected that was what [they] would do." Mr. Kellner further requested that Nascimento "do [his] job as if the contract were in place as [he is] getting paid," and to "continue to manage the portfolio for return and nothing has changed in [his] current contract."

145.    Nascimento had no intention of continuing to work for Compass. By the time he emailed Mr. Kellner on May 4, Nascimento had already established his new fund and all but secured the investment of Novartis in the same. Not surprisingly, Nascimento did not disclose this to Mr. Kellner at the time he claimed his contract had expired (nor at any other time). Instead, Nascimento merely reiterated to Mr. Kellner that he believed his contract had expired and threatened to liquidate the Compass Fund's investment portfolio unless a satisfactory agreement was reached.

146.    In particular, Nascimento indicated that he would only agree to continue at Compass if his role was changed to that of "Outsourced Chief Investment Officer" ("OCIO"), on terms more favorable to him than those included in the Nascimento Agreement. Specifically, Nascimento indicated to Mr. Kellner that he wanted to "provide OCIO services to other [non-Compass] clients."

147.    Mr. Kellner asked Nascimento several questions regarding how this arrangement would work, including what Nascimento's responsibilities would be to Compass going forward, how much time Nascimento would devote to Compass, and whether Nascimento would be sharing trade recommendations with these "other clients" that he wished to provide services for.

148.    At no point in his responses to these questions did Nascimento disclose that he had already formed his own competing hedge fund and had usurped the Novartis investment opportunity for himself.  Instead, Nascimento stated that he "expect[ed] other client mandates to be similar to [Compass]," and that he did not "intend to seek mandates that do not align with [Compass]."  Of course, by that time, Nascimento had already sought out and received a mandate from Novartis.

149.    On May 20, 2020, Mr. Kellner declined to accept Nascimento's OCIO arrangement and accepted Nascimento's resignation from Compass as of May 4, 2020.

150.    Within two weeks of Nascimento's departure, Jussen and Jones informed Mr. Kellner that they would be leaving Compass by the end of May 2020.  Both Jussen and Jones falsely told Mr. Kellner that they were not sure of what their next move would be after leaving Compass.  These, too, were lies, designed to cause Plaintiffs to continue to pay Jussen and Jones a salary for several more weeks while they continued to compete with Plaintiffs.  For months, Jones and Jussen had been working with Nascimento on establishing Nascimento's new fund and securing Novartis's investment in the same with the full assurance from Nascimento that they could leave Compass and join the new fund shortly after Nascimento.

151.    As noted above, it was Jones, who worked out of Compass's New York office at all relevant times, who helped arrange the September 2019 "lighting the spark" meeting between Johnston and Nascimento.  Jones was also present at the January 2020 meeting with Dieringer, Johnston, and Nascimento in Switzerland in which the conspiratorial agreement was solidified. Following the meeting, Jones helped Nascimento draft marketing materials for the new fund, prepared the "data room" for Novartis, and was a participant in several of the email communications between Nascimento and Johnston described herein.  For example, Jones was

present on the "RFP call" with Novartis on April 21, and on April 23, 2020, Jones emailed a link to the "data room" for the new fund directly to Dieringer and others at Novartis (after Nascimento had previously sent the data room to Johnston a month earlier). Jones noted in his email that the data room included "documents we are sharing and/or completing as part of the DD [due diligence process]" for the Novartis investment in the new fund. Jones also received the May 4 RFP and legal due diligence request emails from the Novartis team, highlighting Dieringer and Johnston's knowledge of the fact that Jones' plan was to leave Compass with Nascimento.

152.    In fact, Jones could not help but share his excitement about his and Jussen's plans to join Nascimento's new fund in text messages to friends and family throughout the spring of 2020: "3 of us leaving to stand up our own fund soon," "we're gonna have a much clearer picture on the exit in 2 [weeks] as far as Richmond goes," "***soft commitments for $100m of seed [capital] from swiss pension anchor***."

153.    In addition, Jussen, who worked out of Compass's New York office at all relevant times, was also involved behind the scenes, contacting and interviewing firms that specialize in providing outsourced back-office services to start up hedge funds. Jussen was also present on the April 21 RFP call with Novartis and received the May 4 RFP and legal due diligence request emails from the Novartis team, highlighting Dieringer and Johnston's knowledge of the fact that Jussen's plan was to leave Compass with Nascimento.

154.    Thus, when Jones and Jussen informed Mr. Kellner that they were leaving Compass, both of them knew that, as soon as Nascimento left Compass and formed the new fund, they had jobs waiting for them. And they did; Jones and Jussen were listed as "Founding Partners" of Norbury in the fund's first Form ADV filing with the SEC in July 2020.

155.    However, due to Nascimento's failure to disclose to Mr. Kellner that he had solicited Jones and Jussen to work at his new fund, Mr. Kellner continued to pay Jones and Jussen as employees of Compass through the end of May 2020.  Mr. Kellner had no idea that, for the last several months, Nascimento, Jones, and Jussen had been working, in agreement and with the substantial assistance of Defendants, on one goal: to form a competing fund to Compass and secure Novartis's investment in that fund.

156.    Indeed, in their final months at Compass, Nascimento, Jones, and Jussen were effectively working full-time for Nascimento's competing fund.  In early May, Jones commented in text messages to friends that he was simply biding his time until Nascimento had his discussion with Mr. Kellner; he also noted, several times, that he hoped Mr. Kellner would fire him so that he could receive severance pay.  Around the same time, Nascimento and Jussen engaged in several text messages and emails with the principal of the "outsourced CFO" firm hired by Nascimento to provide back-office services to the new fund.

157.    To ensure that the new fund was ready to hit the ground running as soon as it was officially launched, Nascimento, Jones, and Jussen took a number of confidential documents from Compass on their way out the door (in addition to Compass's confidential information, including Compass trade secrets, that Nascimento and Jones had already shared with Defendants at their direction).  On his last day at Compass, Nascimento used his Bloomberg account (which was provided and paid for by Compass) to send a series of instant messages to Jones and Jussen, each with the code name "Geronimo" (e.g., "GeronimoGlobalMacro," "GeronimoBonds," "GeronimoCommodities"), in a last-ditch effort to steal as much information as possible from Compass for use at his new firm.  Jussen also took with him a confidential document containing

the Compass Fund's portfolio exposures for use at Nascimento's new competing fund, sending that document to his personal email account.

158.    Nascimento, Jones, and Jussen also appear to have accomplished the deletion, from their personal email accounts, of virtually all communications between themselves, Dieringer, and Johnston between January and May 2020 (including those described above).   Indeed, these communications were only discovered by Mr. Kellner through discovery in the State Court Action from third parties.

159.    Given the sudden departure of the Compass core team to start their own, competing, copy-cat hedge fund—which was only made possible with Defendants' substantial assistance and through Defendants' unfair competition and misappropriation of Compass's confidential and trade secret information—Compass was forced to wind down operations.

160.    Compass's closure was a direct and foreseeable result of Defendants' conspiracy with Nascimento.  By encouraging and facilitating the coordinated departure of Compass's entire operational infrastructure while its key employees remained on Compass's payroll preparing a competing fund, Defendants and Nascimento ensured Compass's collapse.

161.    Most devastatingly, Norbury began marketing itself as offering the "Richmond Strategy," and did so using Compass's three-year track record—a track record developed through years of Compass's research, capital investment, and execution.

162.    Under these circumstances, Compass's closure was the inevitable result of Defendants' and Nascimento's wrongful conduct.

***Norbury secures the promised investment from Novartis***.

163.    On May 27, 2020, Norbury Partners LP, the investment manager to the Norbury fund, was officially formed as a Delaware limited partnership.  A number of other Norbury entities

were formed or incorporated around the same time, including Norbury Partners Fund LP (onshore feeder fund) and Norbury Partners International Fund LP (offshore feeder fund).

164.    At this point, however, the formation of the legal entities comprising the Norbury hedge fund complex was a mere formality.  As discussed in great detail above, Nascimento, Jones and Jussen had been working for Nascimento's fund—and thus, competing with Compass—for months.

165.    As Nascimento acknowledged in a text message with a friend in April 2020, Nascimento intended to form Norbury to be "the same thing [as Compass] . . . minus my current partner [Mr. Kellner]."  And that is just what he did: according to Norbury's due diligence questionnaire, Norbury Partners LP (the investment manager to the Norbury funds) was formed to establish, operate, and manage a "discretionary global macro absolute return fund" that "integrates fundamental macro and sustainability analysis into the firm's decision-making process," mirroring the language used by Compass in its own due diligence questionnaire.

166.    In fact, well into 2021, Norbury's due diligence questionnaire included multiple errant references to Compass and Compass-related entities in the disclaimers.  For example, Norbury's due diligence questionnaire indicates that it may "not be reproduced or distributed without the express written permission of Richmond Global Compass Fund Management, LP." Of course, Compass Management has never had any affiliation with Norbury Partners LP; it makes no sense as to why Compass Management would need to provide "express written permission" before a recipient of Norbury's due diligence questionnaire could disseminate it further.  This was doubtless a copy-paste error that was not caught by Nascimento or others at Norbury when they were cribbing from Compass's DDQ and other confidential documents in preparing Norbury's DDQ, which was used to solicit other limited partners to invest in Norbury.

167.    With the legal entities comprising the Norbury fund complex formally established and his exit from Compass confirmed, Nascimento set about finalizing negotiations with Novartis regarding its forthcoming investment, setting an "expected launch date" of September 1, 2020.

168.    Dieringer continued to remain in close contact with Nascimento (often through Johnston) to ensure that everything was proceeding smoothly during this time.  Indeed, throughout the summer of 2020, Dieringer, Johnston, and Nascimento engaged in a significant number of calls and frequent email correspondence regarding the status of negotiations, particular deal terms that the parties were seeking to iron out, and other items related to Novartis's forthcoming investment in the new fund.

169.    For example, in June 2020, when Nascimento had questions about how to respond to certain information requests in the Novartis RFP document, he asked Johnston for assistance. One such question was how Nascimento should fill out the "Reference Contacts" section of the RFP: "The document specifies current investor reference contacts, but we don't have current investors. What are your thoughts here?"  A day later, Johnston told Nascimento that he had spoken to Dieringer and that Dieringer said not to worry about filling out that section.  According to Dieringer, current investor references were not needed because Novartis "***knew the deal and who funded them (Peter [Kellner])… by virtue of his 3 year investment [in Nascimento], he endorsed them.***"  In effect, Dieringer was conveying to Nascimento that he was comfortable investing Novartis pensioners' money with Nascimento because Nascimento would be utilizing the same exact investment strategy at his new fund as the strategy utilized at Compass, and because Mr. Kellner had "endorsed" this strategy by investing his own money in it.

170.    In August and September 2020, Dieringer (on behalf of Novartis) and Nascimento (on behalf of Norbury) exchanged drafts of the agreement governing Novartis's forthcoming

investment in Norbury, known as the "Side Letter." This Side Letter was based on the template agreement that Dieringer had sent Nascimento within days of their January 2020 meeting.

171.    On September 30, 2020, Norbury and Novartis executed the Side Letter, bringing full circle the negotiations of the template agreement that Dieringer sent to Nascimento (through Johnston) in January 2020. The next day, Norbury Partners International Fund LP, Norbury's offshore fund, set up in the Cayman Islands just as Dieringer directed, received $60 million in seed capital from Novartis.

172.    Due to his invaluable assistance in getting Norbury off the ground and committing Novartis as Nascimento's first investor, Dieringer was able to secure for Novartis extremely favorable terms for its investment in Norbury in the Side Letter.

173.    For example, the Side Letter provided that each of the management fee and performance allocation payment in respect of Novartis's investment in Norbury would be reduced by 12.5% for a period of 10 years following Novartis's investment. In other words, Novartis received the Compass strategy through Norbury at a significant discount.

174.    The Side Letter further provided that Novartis would receive "most favored nation" status, meaning that Novartis had the right to obtain any investment terms offered by Norbury to any future investors that Novartis deemed to be more favorable than those applicable to its investment.

175.    The Side Letter further provided that Novartis would have a consent right over virtually all key decisions made at Norbury, including, among other things, the right to consent to (i) amendments or modifications to Norbury's investment objectives and strategy, (ii) any changes in Norbury's governance, (iii) Norbury's entering into any material settlements of disputes or

litigation; (iv) Norbury's ability to waive or reduce the management fee or performance allocation payment for any other investors; (v) the termination or dissolution of the Norbury fund.

176.    The Side Letter also provided that (i) it would be "governed by and construed and enforced in accordance with the laws of New York without regard to principles of conflicts of law," and that (ii) the parties (*i.e.*, Norbury and Novartis) "irrevocably submit[ted] to the non-exclusive jurisdiction of the courts of New York City, New York."

177.    Typically, when Novartis invests in a hedge fund, Novartis first engages an external firm to conduct operational and investment due diligence on that fund.  Here, Novartis did not instruct that firm to conduct due diligence on Norbury until mid-October, after having *already* committed $60 million to Norbury, a start-up fund with no established investment track record.

178.    The fact that Novartis decided to delay this crucial step further demonstrates Novartis's awareness that Nascimento was engaging in wrongdoing by competing with Plaintiffs while still serving as an officer of Compass—which is why Novartis could not initiate the due diligence process until much later in time, when it had already invested—and how Novartis's investment in Norbury was preordained by Dieringer from as early as the January 2020 meeting in Basel.

179.    Notably, the process undertaken by the external due diligence firm was woefully inadequate.  For example, when the external due diligence firm requested that Norbury provide a list of references for Nascimento and Jussen as part of its investment due diligence process, Jones listed Dieringer as Nascimento's first reference – even though it was Novartis who commissioned the due diligence's firm's work on Norbury.

180.    In addition, *none* of the references provided by Jones for Nascimento were Compass employees, despite Nascimento's tenure as CIO being his most relevant (and recent)

experience trading what Novartis had explicitly referred to months earlier as the "Richmond" strategy.  The external due diligence firm did not seek any input from Mr. Kellner regarding the work performed by Nascimento, Jones, or Jussen at Compass (presumably because Defendants did not want to alert Mr. Kellner to the fact that Nascimento had formed his own fund and stolen the Compass investment strategy).

181.    The external due diligence firm ultimately completed operational and investment due diligence on Norbury on behalf of Novartis in late November 2020.

182.    On February 1, 2021, Norbury Partners International Fund LP received an additional $40 million in seed capital from Novartis, bringing Novartis's total investment to $100 million.

183.    Thus, by February 2021, Norbury received the exact amount of capital that Dieringer committed Novartis to investing in Nascimento's fund at their January 2020 meeting, in the precise manner that Dieringer had suggested at that meeting ("***Mark said he would start with an allocation of $60mm and then quickly increase it to $100mm***.").

184.    GRW, and by extension, Johnston, Dieringer's long-time friend, were also rewarded by Nascimento for their extensive efforts in assisting in Norbury's formation and securing Novartis's investment.  On December 31, 2022, Nascimento made GRW a "Member" of Norbury Capital GP, LLC, a limited liability company that serves as the general partner of the Norbury investment funds, entitling GRW to certain economic interests in the fund.  This was Nascimento's way of compensating Johnston for his instrumental role in facilitating the establishment of his fund and helping secure the Novartis investment.

## COUNT I – AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
**(Against All Defendants)**

185.    Plaintiffs hereby repeat and reallege the allegations set forth above as if fully set forth herein.

186.    During the course of his employment with Compass Management as Chief Investment Officer, Nascimento had fiduciary duties to Compass Management and Compass General Partner as Nascimento was entrusted with managing Compass's investments, and Compass Management relied upon Nascimento, under the direction of Mr. Kellner, to manage investments for the benefit of Compass.

187.    Accordingly, Nascimento owed Compass Management and Compass General Partner fiduciary duties of good faith, candor, and loyalty.  After resigning, Nascimento had continuing fiduciary duties to Compass Management and Compass General Partner.

188.    In or about January 2020, Defendants, Nascimento, Jones, and Jussen agreed to join together in an illicit scheme by which Defendants, Jones, and Jussen would substantially assist Nascimento in the breach of his fiduciary duties.

189.    In furtherance of the conspiracy, Nascimento breached his fiduciary duties to Compass by failing to disclose to Plaintiffs, despite having a duty to do so, that (i) he had formed a competing fund to Compass during the time of his employment with Compass, (ii) he was in negotiations with Novartis, facilitated by GRW/Johnston, regarding an investment by Novartis in that fund, and (iii) he had solicited, recruited, and hired Jones and Jussen to work at that new fund. Nascimento also made a number of affirmative misrepresentations to Plaintiffs, including that he was traveling to Europe (in both September 2019, when he met with Johnston in London, and January 2020, when he met with Johnston and Dieringer in Switzerland) to meet with potential Compass investors and to market the Compass Fund, when in reality, Nascimento took both trips

to discuss his establishment of a competing fund to Compass and to solicit an investment by Novartis in the same. Plaintiffs relied on these misrepresentations to their detriment, including by funding Nascimento's efforts to build a competing fund and continuing to pay Jones and Jussen while they assisted Nascimento.

190.    These breaches of fiduciary duties are in the nature of fraudulent misrepresentations and omissions; the misstatements and omissions were material, knowingly or recklessly false; and were deliberately made in order for Mr. Kellner to allow Nascimento to compete with Compass while still serving as an officer thereof. In reliance on these misrepresentations and omissions, Nascimento continued to receive compensation as Compass's CIO, was able to access critical Compass documents and materials that he used to further the establishment of his own fund, and was able to continue working closely with Jones and Jussen at Compass, who were also still being compensated by Compass.

191.    Nascimento owns, directly and indirectly, 100% of Norbury Partners LP, the investment manager of the Norbury fund in which Novartis invested. As of December 2023, Norbury Partners LP had earned over $5.2 million in management fees, with the vast majority of those fees being earned on the investment from Novartis, Norbury's largest investor.

192.    Therefore, Nascimento profited as a result of his breach of his fiduciary duty.

193.    Dieringer, on behalf of and to benefit Novartis, aided and abetted the above-described breaches of fiduciary duty by Nascimento. From his prior interactions with Compass and Mr. Kellner, Dieringer was aware that Nascimento was Compass's CIO, and thus owed fiduciary duties to Compass. Notwithstanding that, Dieringer knowingly induced Nascimento to breach his fiduciary duties by (i) explicitly encouraging Nascimento to leave Compass and form a competing hedge fund while still serving as an officer of Compass, (ii) committing to invest $100

million in that fund upon its establishment, (iii) working with Nascimento to establish and structure the fund in a manner that would be acceptable to Novartis, and (iv) negotiating the terms of Novartis's investment in the fund – all while Nascimento was still employed as Compass's CIO.

194.    At all relevant times described in this Complaint, Dieringer acted with the knowledge of, and on behalf of, Novartis.  Dieringer was Novartis's Head of Alternative Investments & External Mandates, and as such, was responsible for making investment decisions by Novartis's pension fund with respect to hedge funds.  Accordingly, Novartis is liable for Dieringer's wrongful conduct as described herein.

195.    Johnston, on behalf of and to benefit GRW, also aided and abetted the above-described breaches of fiduciary duty by Nascimento.  From his prior interactions with Compass and Mr. Kellner, Johnston was aware that Nascimento was Compass's CIO, and thus owed fiduciary duties to Compass.  Notwithstanding that, Johnston provided substantial assistance to Nascimento's establishment of Norbury by (i) explicitly encouraging Nascimento to leave Compass and form a competing hedge fund while still serving as an officer of Compass, (ii) facilitating communications and negotiations between Nascimento and Dieringer regarding Novartis's investment in that fund, (iii) requesting Nascimento provide, as part of Novartis's due diligence into Nascimento's new fund, a number of confidential Compass documents (including the Compass track record); and (iv) working with Nascimento to establish and structure the fund in a manner that would be acceptable to Novartis – all while Nascimento was still employed as Compass's CIO.

196.    At all relevant times described in this Complaint, Johnston acted with the knowledge of, and on behalf of, GRW.  Johnston was a Managing Partner of GRW and, as such,

was responsible for introducing and marketing investment funds to institutional investors. Accordingly, GRW is liable for Johnston's wrongful conduct as described herein.

197.    Defendants' aiding and abetting of Nascimento's breaches of his fiduciary duties caused significant harm to Plaintiffs.  As a direct and proximate result of Nascimento's breaches, and Defendants' aiding and abetting of those breaches, Plaintiffs have suffered, and continue to suffer, significant lost profits—upwards of $97 million—and the loss of nearly $8 million in costs incurred preparing to market a three-year track record.  Specifically, these breaches, which were aided and abetted by Defendants, directly and proximately caused Compass's demise, despite Compass having achieved extremely strong investment returns over the critical three-year period typically required by institutional investors before investing in a hedge fund.  But for these breaches, Compass would have been able to obtain significant external capital from outside investors.

198.    Because Defendants' aiding and abetting of Nascimento's breaches of fiduciary duties were intentional and deliberately wrongful, Plaintiffs Kellner, Compass General Partner, and Compass Management are also entitled to recover punitive damages.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS
## PURSUANT TO THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 *et seq.*
### (Against All Defendants)

199.    Plaintiffs hereby repeat and reallege the allegations set forth above as if fully set forth herein.

200.    Plaintiffs possessed trade secrets such as, *inter alia*, Compass's track record, PNL attribution, risk management parameters, drawdown guidance, and proprietary approach to ESG-integrated portfolio construction.

201.     Compass's confidential information, including its trade secrets, derived independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other people who could obtain economic value from the disclosure or use of the information.

202.     By virtue of his employment as the CIO of Compass Management, Nascimento was given access to and possessed Compass's confidential information, including the trade secrets described above and herein.

203.     Compass's confidential information, including its trade secrets, were developed and maintained by Compass over the course of years at great time, effort and expense to Compass.

204.     Compass took reasonable measures to maintain the secrecy of its confidential information, including its trade secrets.  These measures included incorporating provisions in Nascimento's employment agreement that required Nascimento to maintain the confidentiality of Compass's information and prohibited the use of that information other than as necessary to perform his duties for Compass and as authorized by Compass; using password-protected computer systems; and marking appropriate documents as confidential and proprietary.

205.     Compass's trade secrets related to products and services used in, and intended for use in, interstate and foreign commerce.  Compass marketed its fund to investors nationwide and internationally (including Novartis), the investment strategy itself involved trading in global markets, and Compass's fund structure involved entities in Delaware, New York, and the Cayman Islands.

206.     Defendants knew that certain of Compass's confidential information, which it elicited and received from Nascimento and Jones, contained or constituted trade secrets belonging to Compass.  Defendants' knowledge of the confidentiality and sensitivity of these trade secrets is

evidenced by the fact that Nascimento and Jones used a secret electronic data room to provide this information to Defendants.

207.    Defendants knew or should have known that Compass's confidential information, including its trade secrets, (i) were confidential; (ii) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (iii) were developed or acquired by Compass at great time, effort and expense; (iv) were maintained as confidential and are not generally available to the public and Compass competitors; (v) would provide significant benefit to Nascimento's new fund, a competitor to Compass; and (vi) were critical to Compass's ability to conduct its business successfully.

208.    Defendants knowingly misappropriated Compass's confidential information, including its trade secrets, without express or implied consent from Compass, by (i) directing Nascimento to provide those trade secrets to them and (ii) using Compass's trade secrets to assist Nascimento in establishing Norbury and securing Novartis's investment therein.

209.    Defendants took several acts in furtherance of the misappropriation of Compass's trade secrets in the United States in that Defendants received trade secrets taken from Compass's servers, which were based in New York, by individuals located in New York.

210.    Defendants were unjustly enriched by its misappropriation of Compass's confidential information, including its trade secrets. Specifically, through this misappropriation, Dieringer orchestrated the establishment of Nascimento's fund and Novartis's investment in the same, which resulted in (i) Novartis receiving extremely beneficial terms on that investment and (ii) GRW being admitted to the limited liability corporation that serves as the general partner to the Norbury investment funds.

211.    Defendants' misappropriation of Compass's trade secrets was willful and malicious, as evidenced by Defendants' conspiracy to steal these trade secrets, knowledge of Nascimento's fiduciary duties to Compass, provision of specific instructions on what confidential information and trade secrets to steal, and use of those misappropriated trade secrets to destroy Compass's business.

212.    As a direct and proximate result of Defendants' misappropriation of Compass's confidential information, including its trade secrets, Plaintiffs have suffered direct and consequential damages, including loss of the economic value of the trade secrets, destruction of Compass's competitive advantage, lost profits from an inability to raise capital, and the lost costs of developing the trade secrets.  Plaintiffs thus are entitled to recover actual, incidental, compensatory, exemplary and/or punitive damages, attorneys' fees, and other damages in an amount to be determined at trial.

**COUNT III – UNFAIR COMPETITION**
**(Against All Defendants)**

213.    Plaintiffs hereby repeat and reallege the allegations set forth above as if fully set forth herein.

214.    As detailed herein, Defendants engaged in a conspiracy with Nascimento, Jones, and Jussen to assist Nascimento in establishing his competitor hedge fund, including while Nascimento was still employed as CIO of Compass, and concealing the same from Plaintiffs.

215.    Defendants' bad faith is evidenced by, among other things, (i) secretly meeting with Nascimento to plot the establishment of a competitor fund while knowing that Nascimento was still employed at Compass; (ii) instructing Nascimento and Jones to provide to Defendants, and to otherwise use, Compass's confidential information in connection with the establishment of Nascimento's fund; (iii) Novartis purposefully delaying sending Nascimento the RFP for

Novartis's investment in Nascimento's fund until Nascimento informed Mr. Kellner that he believed his contract had expired; (iv) Novartis sending Nascimento the RFP entitled (in part) "Richmond strategy," underscoring Novartis's knowledge that Nascimento's new fund was to utilize the same exact investment strategy as Compass; and (v) agreeing to conceal their communications with Nascimento, Jones, and Jussen regarding the establishment of Nascimento's new fund from Plaintiffs.

216.    As a result of Defendants' wrongful and unfair conduct, Defendants reaped what they did not sow: Novartis received extremely beneficial terms on its investment in Norbury and GRW was admitted to the limited liability corporation that serves as the general partner to the Norbury investment funds.

217.    As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered, and continue to suffer, significant economic injury and damages including loss of market value, the loss of the value of nearly eight million dollars in costs incurred preparing to market a three-year track record, and lost profits in an amount no less than $97,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment and relief against Defendants:

(i)    Awarding Plaintiffs damages in an amount no less than $97,000,000;

(iv)    Awarding Plaintiffs exemplary and/or punitive damages of at least $194,000,000, in accordance with 18 U.S.C. § 1836(b)(3)(C);

(v)    Awarding Plaintiffs their costs, attorneys' fees, and pre- and post-award interest; and

(vi)    Granting Plaintiffs any further relief that the Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues that are so triable.


Dated:  August 7, 2025

*/s/ Adam M. Harris*
ADAM M. HARRIS
Israel David LLC
60 Broad Street, Suite 2900
New York, New York 10004
adam.harris@davidllc.com
(212) 350-8852

*Attorneys for Plaintiffs*
*RICHMOND GLOBAL COMPASS FUND*
*MANAGEMENT, LP, RICHMOND*
*GLOBAL COMPASS FUND*
*MANAGEMENT GP, LLC, RICHMOND*
*GLOBAL CAPITAL GP, LLC, and PETER*
*KELLNER*