UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

RICHMOND GLOBAL COMPASS FUND MANAGEMENT, LP; RICHMOND GLOBAL COMPASS FUND MANAGEMENT GP, LLC; RICHMOND GLOBAL COMPASS CAPITAL GP, LLC; PETER KELLNER,

Plaintiffs,

-v-

NOVARTIS INTERNATIONAL AG; MARK DIERINGER; GRW AG; GARY JOHNSTON,

Defendants.

-------------------------------------------------------x

No. 25-CV-6490-LTS-GS

MEMORANDUM OPINION AND ORDER

Richmond Global Compass Fund Management, LP ("Compass Management"), Richmond Global Compass Fund Management GP, LLC ("Compass General Partner"), Richmond Global Compass Capital GP, LLC ("Compass GP LLC"), and Peter Kellner ("Kellner," and collectively, "Plaintiffs") bring this action under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C.A. § 1836 (Westlaw through P.L. 119-111), and also assert state law claims of unfair competition and aiding and abetting breach of fiduciary duty, against Novartis International AG ("Novartis"), Mark Dieringer ("Dieringer"), GRW AG ("GRW"), and Gary Johnston ("Johnston," and collectively, "Defendants"). Plaintiffs allege that Defendants conspired to steal Plaintiffs' hedge fund strategy. (Docket entry no. 37 ("Amended Complaint" or "Am. Compl.") ¶ 1.)

Before the Court are Novartis and Dieringer's motion to dismiss the Amended Complaint (docket entry no. 42), and GRW and Johnston's motion to dismiss the Amended Complaint (docket entry no. 45 (collectively, the "Motions")). The Court has reviewed thoroughly the parties' submissions, and, for the following reasons, the Motions are denied.

## I. Background

The following allegations are taken from the Amended Complaint and are presumed true for the purposes of the Motions to the extent that they are not conclusory.

### A. Parties and Relevant Entities

Plaintiff Compass Management is a Delaware limited partnership with its principal place of business in New York. It is "an investment management firm dedicated to the positive impact of [environmental, social, and governance ('ESG')] investments on performance and profitability." (Am. Compl. ¶¶ 2, 50.) Kellner, a resident of Massachusetts, is the founder, chairman, limited partner, and chief executive officer ("CEO"), nonparty Decio Nascimento ("Nascimento") was a limited partner and the former chief investment officer ("CIO"), and Plaintiff Compass General Partner is a general partner. (Id. ¶¶ 28-29, 31, 53; docket entry no. 7 ("Pl. 7.1 St.") ¶ 1.)

Plaintiff Compass General Partner is a Delaware limited liability company with its principal place of business in New York. (Am. Compl. ¶ 29.) Kellner is a member of Compass General Partner, as was Nascimento. (Id. ¶ 53; Pl. 7.1 St. ¶ 2.)

Plaintiff Compass GP LLC is also a Delaware limited liability company with its principal place of business in New York. (Am. Compl. ¶ 30.) The Amended Complaint refers to Compass Management, Compass General Partner, and Compass GP LLC collectively as "Compass." (Id. ¶ 5.)

In March 2018, Kellner established three "funds," none of which is a party to this litigation: (1) Richmond Global Compass Capital Offshore, Ltd.; (2) Richmond Global Compass Capital, LP; and (3) Richmond Global Compass Capital Master Fund, Ltd. (collectively, "Compass Fund" or "Fund entities"). (Id. ¶ 4.) "[I]nvestor capital was pooled in the Compass Fund, and Compass Management was responsible for investing that capital and managing those investments." (Id.)

Defendant Novartis is a wholly owned subsidiary of a multinational pharmaceutical company with its principal place of business in Switzerland. (Id. ¶ 32.) Defendant Dieringer is a Swiss citizen who served as the "Head of Alternative Investments and External Mandates" of Novartis. (Id. ¶ 33.)

Defendant GRW is a marketer of investment funds to potential institutional investors with its principal place of business in Switzerland. (Id. ¶ 34.) Defendant Johnston is a Swiss citizen[1] who was the managing partner of GRW. (Id. ¶ 35.)

B. Factual Background

In 2019, GRW arranged a meeting with Kellner and representatives of Novartis, including Dieringer, to discuss a multi-million-dollar investment in Compass; the potential investment was discussed at the meeting, as well as Dieringer's intention to follow up regarding further information on the Compass Fund. (Id. ¶ 88.) Kellner, however, discovered that "GRW was legally unable to market the Compass Fund to qualified investors (such as Novartis) because GRW did not have a distribution license from FINMA, the Swiss financial regulator." (Id. ¶ 96.) Although Johnston suggested that GRW could still introduce Compass' strategy, but not the

[1] Johnston asserts that he is not a Swiss citizen, but rather a United States citizen domiciled in Switzerland. (Docket entry no. 60 ("GRW Reply") at 8 n.3.) This distinction is not material to the resolution of the Motions.

Compass Fund, to Novartis, Kellner decided to postpone further discussions with GRW until a Swiss regulatory change took effect in January 2020. (See id. ¶¶ 98-99.)

Plaintiffs allege that Johnston then turned to other Compass employees, including Nascimento, Frank Jones II ("Jones," who served as Vice President of Operations for Compass Management), and Sean Jussen ("Jussen," who served as Risk Manager for Compass Management), to pursue the otherwise forgone investment opportunity. (See id. ¶¶ 37-38, 102, 106.) Johnston met with Nascimento and Jones in September 2019, without Kellner, to "encourag[e] Nascimento to cut out Mr. Kellner, take with him the Compass strategy that Novartis wanted to invest in, and form a competing hedge fund." (Id. ¶ 104.) Subsequently, on January 10, 2020, Johnston declined to continue further dealings with Compass. (Id. ¶ 113.) On January 14, 2020, Nascimento and Jones met with Johnston and Dieringer at Novartis' campus in Basel, Switzerland, where "Dieringer told Nascimento that Novartis wanted to invest with Nascimento directly, in a new hedge fund to be formed by Nascimento, but that would still deploy the Compass strategy." (Id. ¶ 116.) Plaintiffs allege that, "[a]s part of this plot, at the Defendants' direction, Nascimento (with Jussen and Jones) would build the competing fund while still working for and being paid by Compass, and use and provide to Novartis and GRW Compass's confidential information to do so." (Id.)

A few days later, Dieringer sent Johnston, for transmission to Nascimento, a draft investment agreement to serve as a template for Nascimento's soon-to-be-formed fund. (Id. ¶¶ 121-23.) Johnston then told Nascimento and Jones that "it is now your move – to share your numbers with [Dieringer]." (Id. ¶ 123.) Nascimento responded with a proposed budget for the new fund that included Compass' internal financial projections, as well as a markup of the draft investment agreement that included a New York choice-of-law provision. (Id. ¶¶ 127-28.)

Johnston then instructed Nascimento to "obtain, and provide to him, due diligence information on his soon-to-be-formed fund, located on Plaintiffs' server in New York City, which Johnston would then provide to Dieringer." (Id. ¶ 133.) "Among other items requested, Johnston specifically asked Nascimento to provide Compass's trade secrets, including how Compass 'use[s] ESG in [its] investment process/alpha generation,' 'pnl attribution,' '[investment] portfolio management/risk parameters,' 'drawdown guidance (trade & portfolio),' and 'general narrative on portfolio construction/approach.'" (Id. (alterations in original).) Johnston "noted in the email that he 'assum[ed] you don't have the above materials for the new firm'—underscoring his knowledge that these were materials belonging and pertaining to Compass." (Id. (alterations in original).) On March 9, 2020, Nascimento and Jones prepared the requested information and shared it with Johnston, and later Novartis, through a link to a "secret electronic 'data room'" containing "documents reflecting Compass's confidential and trade secret information requested by Johnston a few weeks earlier." (Id. ¶ 136.) Jones sent this same data-room link to Dieringer in April 2020. (Id. ¶ 142.)

On May 4, 2020, a colleague of Dieringer sent to Nascimento, Jones, and Jussen, with Dieringer and Johnston copied, Novartis' request for proposal for the "Richmond Strategy (new fund to be named)." (Id. ¶¶ 153-55.) The same day, Nascimento informed Kellner that he believed his employment contract with Compass had expired and that he would leave Compass unless more favorable terms were offered to him. (Id. ¶ 159.) On May 20, 2020, Kellner refused to accept Nascimento's terms and accepted his resignation from Compass as of May 4, 2020. (Id. ¶ 165.) Jussen and Jones soon followed suit, resigning by the end of the month. (Id. ¶ 166.) Plaintiffs allege that Nascimento, Jones, and Jussen "took a number of confidential documents

from Compass on their way out the door," including "a confidential document containing the Compass Fund's portfolio exposures for use at Nascimento's new competing fund." (Id. ¶ 173.)

Compass was eventually "forced to wind down operations." (Id. ¶ 174.) On May 27, 2020, Norbury Partners LP ("Norbury"), Nascimento's new fund, was officially formed. (Id. ¶ 178.) On September 30, 2020, Norbury and Novartis executed an investment agreement, the "Side Letter." (Id. ¶¶ 188-93.) On December 31, 2022, Nacimiento made GRW a member of Norbury Capital GP, LLC, a general partner of the Norbury investment funds. (Id. ¶ 202.)

Kellner and certain Compass entities sued Nascimento, Jussen, Jones, Norbury, and other Norbury entities in New York state court in 2021 (the "New York State Court Action"). (Id. ¶ 23 n.7.) After discovery in the New York State Court Action, where Plaintiffs allege that they learned of Defendants' involvement in Nascimento's wrongful conduct, Plaintiffs filed this suit on August 7, 2025. (See id.; docket entry no. 1.) Dieringer and Novartis moved to dismiss the Amended Complaint, as did Johnston and GRW in a separate motion, on January 20, 2026. (See Motions.)

## II. Discussion

Defendants argue that the Amended Complaint does not establish personal jurisdiction or state a claim upon which relief may be granted, and move to dismiss the pleading pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively. Because personal jurisdiction is generally treated "as a threshold question to be address prior consideration of the merits of a claim," the Court will assess personal jurisdiction first. ONY, Inc. v. Cornerstone Therapeutics, Inc., 720 F.3d 490, 498 n.6 (2d Cir. 2013).

A. Personal Jurisdiction

"In evaluating a motion to dismiss for lack of personal jurisdiction, the Court must first determine whether the exercise of personal jurisdiction is proper according to the law 'of the forum state, in this instance New York.'" Barnes v. Block, No. 22-CV-7236-LTS, 2025 WL 1736519, at *3 (S.D.N.Y. June 23, 2025) (quoting Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997)). Then, the Court must "analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010). At this pleading stage, Plaintiffs "need only make a prima facie showing of personal jurisdiction over" Defendants, and the Court construes "the pleadings and affidavits in the light most favorable to [P]laintiffs, resolving all doubts in their favor." Porino v. Marward Shipping Co., Ltd., 521 F.3d 122, 126 (2d Cir. 2008).

In relevant part, New York's long-arm statute provides personal jurisdiction over any nondomiciliary who "(1) transacts any business within the state or contracts anywhere to supply goods or services in the state" or "(2) commits a tortious act within the state." N.Y. C.P.L.R. § 302(a).[2] Defendants argue that neither subsection applies to support the exercise of personal jurisdiction over them, while Plaintiff responds that both do. Because personal jurisdiction is proper under N.Y. C.P.L.R. section 302(a)(2) ("Section 302(a)(2)"), the Court does not address any other grounds.

---

2 The Amended Complaint alleges that personal jurisdiction over Novartis and GRW is properly exercised under N.Y. C.P.L.R. section 302(a)(3) as well. (Am. Compl. ¶ 46.) Both Defendants argue that this provision does not provide personal jurisdiction over them. (See Novartis Mem. at 8-9; docket entry no. 48 ("GRW Mem.") at 17-19.) Plaintiffs do not respond to their argument and thus forfeit any reliance on section 302(a)(3). See Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC, No. 21-CV-9147-KPF, 2023 WL 373143, at *3 (S.D.N.Y. Jan. 24, 2023).

1. Section 302(a)(2)

Pursuant to Section 302(a)(2), Plaintiffs advance the recognized "conspiracy theory" of personal jurisdiction, under which "acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2)." Chrysler Cap. Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.NY. 1991). To succeed on this theory, Plaintiffs must plausibly allege, in addition to a conspiracy involving overt acts in New York, that "(1) the out-of-state co-conspirator[s] had an awareness of the effects of the activity in New York, (2) the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." Heinfling v. Colapinto, 946 F. Supp. 260, 265 (S.D.N.Y. 1996).

Plaintiffs argue that the January 14, 2020, meeting in Basel marked the beginning of the conspiracy between Defendants and Nascimento and Jones, which, followed by Nascimento's overt acts in New York, provides a proper basis for personal jurisdiction over all Defendants. (Docket entry no. 55 ("Pl. Mem.") at 15-17.) Novartis and Dieringer, on the other hand, contend that Plaintiffs "allege no facts showing that Novartis or Dieringer knew—or reasonably foresaw—that any conspiratorial acts would occur in New York." (Novartis Mem. at 7.) GRW and Johnston point out that the Amended Complaint does not allege that "Johnston was arranging or directing anything," nor that Johnston would benefit from the alleged conspiracy, as required for personal jurisdiction. (GRW Mem. at 14-17 (citing FAT Brands Inc. v. Ramjeet, 75 F.4th 118, 126 (2d Cir. 2023)).)

The Court holds that sufficient grounds for conspiracy jurisdiction have been pleaded as to all Defendants. First, Plaintiffs plainly allege that a conspiratorial agreement was

formed among "Dieringer (on behalf of Novartis), Johnston (on behalf of GRW), Nascimento, Jussen, and Jones . . . to facilitate the creation—and funding—of Nascimento's competing hedge fund." (Am. Compl. ¶ 42); see Loc. 875 I.B.T. Pension Fund v. Pollack, 992 F. Supp. 545, 557 (E.D.N.Y. 1998) ("Section 302(a) expressly allows for the exercise of personal jurisdiction over those who commit tortious acts through an agent. Thus, . . . the New York-related activity of a corporate officer, director or employee may subject both the corporation and the individual corporate representative to jurisdiction."). The Amended Complaint explains that, at the January 14, 2020, meeting in Basel, Defendants directed Nascimento to "build the competing fund while still working for and being paid by Compass, and use and provide to Novartis and GRW Compass's confidential information to do so." (Am. Compl. ¶ 116.) Plaintiffs likewise plead that Defendants were aware of the effects of these directives in New York because "Defendants knew that Compass was headquartered in New York and that Nascimento, Jones, and Jussen regularly worked out of Compass's New York office." (Id. ¶ 43.) And the Amended Complaint provides numerous examples of an agreement to create a new fund using Compass' misappropriated information, evinced by regular communications among Dieringer, Johnston, and Nascimento and Johnston's request for proprietary information from Compass' server in New York, which he also intended to share with Dieringer. (See, e.g., id. ¶¶ 123-45.) Plaintiffs thus plausibly allege that Defendants directed co-conspirators to engage in activity to Defendants' benefit and were aware of the effects of their directed activity in New York.

Defendants' remaining objections are also unavailing. Although Novartis and Dieringer argue that it was not foreseeable that any conspiratorial acts would take place in New York (Novartis Mem. at 7), it is reasonably inferable from the Amended Complaint that Defendants would have expected their directives to be carried out in New York. As for GRW

and Johnston's objection that the alleged conspiracy did not benefit Johnston, their factual assertion is not properly considered at the pleading stage, as it is inconsistent with the Amended Complaint and even with Defendants' own briefing. (See Am. Compl. ¶ 202 (describing how GRW and Johnston "were rewarded by Nascimento for their extensive efforts in assisting in Norbury's formation and securing Norbury's investment"); GRW Mem. at 17 (explaining that "Johnston benefit[ted] from switching tracks" from Compass to Norbury because "Novartis had been turned off by Kellner, and, therefore, marketing Kellner's fund to Novartis would be futile").)

The Court thus concludes that it can properly exercise personal jurisdiction over all Defendants under subsection 302(a)(2).

2. Due Process

After determining that a state's long-arm statute furnishes a proper basis for the exercise of personal jurisdiction, the Court must assess whether a plaintiff has "demonstrate[d] that the exercise of personal jurisdiction comports with due process." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82 (2d Cir. 2018). That inquiry proceeds in two steps, examining (1) whether a plaintiff has sufficiently alleged "minimum contacts . . . where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there"; and (2) "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." Id. (quoting Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013)).

The parties devote relatively little attention to the constitutional requirement that the exercise of personal jurisdiction comports with due process. Novartis and Dieringer briefly argue that "exercising jurisdiction would violate due process because [they] neither 'purposefully

avail[ed]' themselves of New York, nor could 'reasonably anticipate being haled into court' here." (Novartis Mem. at 9.) Plaintiffs argue that this is not the rare case in which the exercise of personal jurisdiction under section 302 violates due process, as Defendants purposefully engaged in multiple conspiratorial acts aimed at New York and thus should have anticipated being subject to jurisdiction in New York's courts. (Pl. Mem. at 17-18.)

For largely the same reasons that supported personal jurisdiction as a statutory matter, the exercise of personal jurisdiction here also comports with due process. Plaintiffs have sufficiently alleged that Defendants' directives to employees located in New York to procure proprietary information from servers located in New York constitute minimum contacts to justify the exercise of personal jurisdiction as a matter of due process. See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC, 22 F.4th 103, 124 (2d Cir. 2021) (holding that due process does not "require more than that a defendant purposefully availed itself of the forum through the overt acts of its co-conspirator"). Defendants do not contend that the exercise of personal jurisdiction would violate notions of fair play and substantial justice, and the record provides no viable basis for such a contention in any event.

B. Individual or Derivative Injury

Defendants argue that Plaintiffs lack prudential standing[3] to pursue any of their claims individually "because their asserted injuries are derivative of harms allegedly suffered by the Compass [F]und itself." (Novartis Mem. at 13.) Plaintiffs, including Kellner, Compass

---

[3] "[T]he question whether an individual shareholder is suing to enforce his own rights versus those of the corporation presents an issue of prudential standing." AHW Inv. P'ship v. Citigroup, Inc., 806 F.3d 695, 699 (2d Cir. 2015) (citing Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd., 493 U.S. 331, 336-37 (1990)). This concept is distinct from the jurisdictional question of standing under Article III of the Constitution. See In re Facebook, Inc., Initial Pub. Offering Derivative Litig., 797 F.3d 148, 155-56 (2d Cir. 2015) (distinguishing the two).

Management, Compass General Partner, and Compass GP LLC, managed or derived fees and distributions from separate corporate entities comprising the Compass Fund. (See Am. Compl. ¶¶ 56-59.) Defendants assert that, because "the damages [Plaintiffs] seek are tied to the [Compass Fund's] purported losses by way of fees or distributions they supposedly would have received from the [Compass Fund]," Plaintiffs suffered no direct injury and therefore lack prudential standing. (Novartis Mem. at 13.)

Because all relevant Plaintiff entities were established in Delaware, "Delaware law controls whether [P]laintiffs' claims are properly characterized as direct or derivative." AHW, 806 F.3d at 699. That inquiry "turn[s] solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004); see Culverhouse v. Paulson & Co. Inc., 133 A.3d 195, 198 n.9 (Del. 2016) (noting that the Tooley test applies similarly to claims involving limited partnerships).

Plaintiffs have sufficiently alleged a direct, rather than a derivative, injury. First, regarding Plaintiffs' claim for aiding and abetting a breach of fiduciary duty, the Amended Complaint makes clear that Nascimento's alleged fiduciary duties were owed to certain of the Plaintiffs in this case, Compass Management and Compass General Partner. (Am. Compl. ¶¶ 214-15.) Contrary to Defendants' argument, Plaintiffs' injury is alleged to have resulted from direct actions aimed at the Compass Plaintiffs, including direct misrepresentations, diversion of valuable information, and the establishment of a competitor fund in concert with a potential client. By contrast, Plaintiffs do not allege that Nascimento owed any fiduciary duty to the Compass Fund entities, which are not named as parties here. This fact alone distinguishes this

case from the authorities Defendants marshal to suggest that Plaintiffs' injury is derivative. See, e.g., Abate v. Fifth Third Bank, No. 13-CV-9078-VSB, 2018 WL 1569260, at *5 (S.D.N.Y. Mar. 27, 2018) (recognizing a direct injury "where the wrongdoer has breached a duty owed directly to the shareholder that is independent of any duty owing to the corporation" (citing Serino v. Lipper, 994 N.Y.S.2d 64, 69 (1st Dep't 2014))). For Nascimento, as alleged, "to make repeated efforts to promote" a competing investment fund "to such a significant client . . . was to violate his duty of loyalty to [Compass]." Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 661 (S.D.N.Y. 2005), aff'd, 469 F.3d 284 (2d Cir. 2006).

Defendants point to what they characterize as the derivative nature of Plaintiffs' claim for damages, but Defendants ignore the direct nature of Nascimento's alleged breach of fiduciary duty to certain Compass Plaintiffs. Defendants argue that the "lost management fees, incentive allocations, and distributions" alleged as damages in the Amended Complaint are "'quintessentially' derivative" of injuries to the Compass Fund. (Docket entry no. 61 ("Novartis Reply") at 5-6 (quoting Serino, 994 N.Y.S.2d at 69).) Defendants' analysis ignores facts pleaded by Plaintiffs. For example, the Amended Complaint alleges $8 million in costs to Plaintiffs as a result of Defendants' aiding and abetting Nascimento's breach of fiduciary duty, even aside from the lost profits traceable to the Compass Fund. (Am. Compl. ¶ 236.) Beyond such allegations, downstream consequences suffered by the Compass Fund do not diminish the individual injury that the Compass Plaintiffs suffered directly by virtue of Nascimento's alleged breach of fiduciary duty to Compass entities. See Case Fin., Inc. v. Alden, No. 1184-VCP, 2009 WL 2581873, at *7 (Del. Ch. Aug. 21, 2009) (concluding that a plaintiff's "ability to pursue a suit against [an officer] directly would not depend . . . on whether the entirety of the damage was

sustained directly by [the plaintiff] or derivatively through [a subsidiary]," as the officer "owed this duty to [the plaintiff] directly").

The same conclusion holds true under the DTSA. See Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Hann, 06-CV-14312-DAB, 2008 WL 11515992, at *1 n.1 (S.D.N.Y. June 10, 2008) ("[T]he Court must analyze standing for the state and federal claims separately." (citing Drachman v. Harvey, 453 F.2d 722, 726-27 (2d Cir. 1972))). Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action." 18 U.S.C. § 1836(b)(1); see id. § 1839(4) (defining "owner" as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed"). The Amended Complaint alleges that Plaintiffs owned the confidential information that Nascimento shared. (See, e.g., Am. Compl. ¶ 118 (describing Nascimento's "access to Compass's confidential information and trade secrets (which he would ultimately provide to Defendants at their direction in connection with establishing the new fund)"); id. ¶ 133 (describing different categories of "Compass's trade secrets"); id. ¶¶ 136, 173-74, 240-52.) Defendants assert that the owner of the alleged trade secrets is "the fund, not [Plaintiff] entities." (GRW Reply at 6.) At the pleading stage, however, Plaintiffs' allegations must be taken as true and construed in the light most favorable to them. Because Plaintiffs have alleged that they own the trade secrets "potentially at issue in this action," Zabit v. Brandometry, LLC, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021), Plaintiffs have standing to sue under the DTSA.[4]

---

[4] The same reasoning establishing standing to assert a DTSA claim applies similarly to Plaintiffs' standing to assert their unfair competition claim. See Braun v. Giarratano, No. 00-CV-1767-HGM, 2002 WL 1916368, at *4 (N.D.N.Y. July 30, 2002).

Because the Amended Complaint makes clear that Plaintiffs suffered a direct injury, rather than a derivative injury through the Compass Fund, the Motions are denied to the extent they seek dismissal for lack of standing to sue.

C. Merits

1. Aiding and Abetting a Breach of Fiduciary Duty Claim

Defendants next argue that Plaintiffs have failed to state a claim for aiding and abetting a breach of fiduciary duty upon which relief may be granted. To state such a claim, a plaintiff must allege "(1) a breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) [that] the defendant knowingly induced or participated in the breach; and (3) [that] plaintiff suffered actual damages as a result of the breach." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009); see In re Santa Fe Pac. Corp. Shareholder Litig., 669 A.2d 59, 72 (Del. 1995). Defendants assert that Plaintiffs have failed to plead sufficiently that Defendants had actual knowledge that Nascimento breached his fiduciary obligations or provided substantial assistance in breaching those obligations. (Novartis Mem. at 23-24; GRW Mem at 20.)

The Amended Complaint, read in the light most favorable to Plaintiffs, plausibly alleges actual knowledge. Plaintiffs allege that both Dieringer and Johnston had "awareness of Nascimento's title as CIO of Compass, his knowledge of Nascimento's investment decision-making role at Compass, and his extensive experience in the hedge fund industry" and that this awareness formed the basis of their "actual knowledge that Nascimento owed Compass fiduciary duties." (Am. Compl. ¶¶ 224, 231.) Plaintiffs further allege that, throughout meetings between Defendants and Nascimento, Defendants were aware of Nascimento's role at Compass and indeed took advantage of that role to procure proprietary information and invest in a newly

formed competitor fund. (See id. ¶¶ 115-123, 132-45.) Defendants' attempt to recharacterize these allegations as "preparatory steps" undertaken by Nascimento, unbeknownst to Defendants, is plainly at odds with the facts pleaded in the Amended Complaint. See DFO Glob. Performance Com. Ltd. (Nev.) v. Nirmel, No. 20-CV-6093-JPO, 2021 WL 3475596, at *8 (S.D.N.Y. Aug. 6, 2021) ("It is axiomatic that corporate officers owe fiduciary duties to their corporation. And it is plain that any employee funneling trade secrets to a competitor would be breaching his duties of good faith and loyalty." (citation omitted)). Their argument thus amounts to a challenge to Plaintiff's factual contentions, which is irrelevant to the resolution of the instant motion practice. Plaintiff's claim of aiding and abetting a breach of fiduciary duty therefore survives dismissal.

2. DTSA Claim

i. Statute of Limitations

GRW and Johnston (joined by Novartis and Dieringer (Novartis Mem. at 9 n.2)) argue that Plaintiffs' DTSA claim is untimely. (GRW Mem. at 21-22); see 18 U.S.C. § 1836(d) (providing three years to pursue a civil action). GRW and Johnston argue that Plaintiffs were able to discover the alleged misappropriation by Defendants more than three years prior to the commencement of this action in 2025, as evidenced by the commencement of the State Court Action in 2021. (GRW Mem. at 21-22.) Plaintiffs respond that, while they were aware of Nascimento's disclosure of confidential information when they brought the State Court action, they only learned of Defendants' role in the conspiracy through discovery in the State Court Action and commenced this action promptly following the discovery of the pertinent facts. (Pl. Mem. at 21.)

Ordinarily, because a statute of limitations argument is an affirmative defense, resolving whether claims are barred as untimely "requires a fact-specific evaluation that is not determinable at this [pleading] stage of the litigation." Canon U.S.A., Inc. v. Cavin's Bus. Sols., Inc., 208 F. Supp. 3d 494, 501 (E.D.N.Y. 2016); Bice v. Robb, 324 F. App'x 79, 81 (2d Cir. 2009) ("The question whether the statute of limitations has run turns on a number of unresolved issues that would benefit from discovery."). This case is no exception. The Amended Complaint directly alleges that, "[a]t the time the State Court Action was filed, . . . Plaintiffs were unaware of the role that Defendants played in Nascimento's wrongful conduct." (Am. Compl. ¶ 23 n.7.) Whether that allegation is true is a matter to be resolved at a later stage of litigation, rather than a motion to dismiss. Although GRW and Johnston offer details comparing the pleadings in the State Court Action with the Amended Complaint in this action (GRW Reply at 8-12), the factual nature of their counterargument highlights its unsuitability for resolution at the pleading stage, particularly because this Court is obliged at this stage to construe the pleadings in the light most favorable to Plaintiffs. The Court will therefore deny this aspect of the Motions.[5] Defendants may raise this issue again at the summary judgment stage once discovery has been completed.

ii. Trade Secret Claim

Novartis and Dieringer argue that Plaintiffs have not alleged that the information Nascimento allegedly funneled to Defendants was a trade secret within the meaning of the DTSA. The DTSA defines a trade secret as information whose owner "has taken reasonable measures to keep . . . secret" and that "derives independent economic value . . . from not being generally known" or "not being readily ascertainable through proper means." 18 U.S.C.

[5] This conclusion applies with equal force to GRW and Johnston's argument that the unfair competition claim is untimely, even if a three-year statute of limitations applies, as GRW and Johnston argue. (See GRW Mem. at 22.)

§ 1839(3)(A)-(B). Novartis and Dieringer argue that the Amended Complaint provides "only generic categories of supposed trade secrets without alleging specific facts as to their economic value or how that value is derived from the information remaining secret." (Novartis Mem. at 15.) They further argue that the information at issue in this case was marketed publicly and was not kept secret. (Id. at 16-17.)

Like the statute of limitations issue discussed above, the "determination of whether particular information is a trade secret is typically a fact-intensive inquiry not amenable to resolution on a motion to dismiss." Garvey v. Face of Beauty LLC, 634 F. Supp. 3d 84, 96 (S.D.N.Y. 2022). "At the pleading stage, a plaintiff must do little more than describe the [trade] secret with sufficient specificity that its protectability can be assessed." DFO, 2021 WL 3475596, at *4 (internal quotation omitted); see Tesla Wall Sys., LLC v. Related Cos., L.P., No. 17-CV-5966-JSR, 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017) ("[T]here is no heightened pleading requirement on actions brought under the DTSA.").

Plaintiffs have done so here, alleging that the misappropriated information comprises four discrete and specific categories, was valuable, and was kept reasonably secret. First, the Amended Complaint provides sufficient detail as to the character of the alleged trade secrets to withstand dismissal. Plaintiffs describe how "P&L attribution," "risk parameters," drawdown guidance," and "portfolio construction and ESG integration strategy" encompassed "the specific components of Compass that made the fund what it was and distinguished it from its competitors," specifically by controlling the types of investment positions that Compass would select and adjust. (Am. Compl. ¶¶ 137-38.) Similar allegations in DTSA claims have passed muster at the pleading stage. See, e.g., Helio Logistics, Inc. v. Mehta, No. 22-CV-10047-NSR, 2023 WL 1517687, at *4 (S.D.N.Y. Feb. 3, 2023); PRCM Advisers LLC v. Two Harbors

Inv. Corp., No. 20-CV-5649-LAK, 2021 WL 2582132, at *15 (S.D.NY. June 23, 2021). Furthermore, Plaintiffs "provide[] additional detail regarding the composition and functionality of each of the items listed," outlining how each category of information contributed to Compass' investment strategy. SS&C Techs. Holdings, Inc v. Arcesium LLC, No. 22-CV-2009-TMR, 2024 WL 5186530, at *7 (S.D.N.Y. Dec. 20, 2024). Plaintiffs' allegations therefore meet the thresholds of value and ascertainability at the pleading stage to withstand dismissal.

Novartis and Dieringer's argument that these allegations are too generic again amounts to no more than drawing inferences in Defendant's favor and previewing a factual dispute that cannot be engaged at this stage of the litigation. They suggest that Plaintiffs fail to allege sufficiently that this information gave an economic benefit to Compass, but the Amended Complaint sets out how the information "constituted the blueprint of Compass's unique investment strategy." (Am. Compl. ¶ 241.) For instance, Plaintiffs allege that "Compass's risk parameters detailed the hard limits on Compass's portfolio" and that "Compass's drawdown guidance showed the circumstances under which the Fund would be required to liquidate a portion of its portfolio to preserve capital." (Id. ¶ 137.) Plaintiffs further allege that "Compass's P&L attribution provided a granular breakdown of where Compass was making (or losing) money in its portfolio, including specific sectors, asset classes, and geographic regions" and that "Compass's portfolio construction and ESG integration strategy" provided a framework for selecting and managing different positions while balancing ESG factors. (Id.) In fact, these categories mirrored those listed in Johnston's request to Nascimento (id. ¶ 133), providing further support for the specific and valuable quality of the alleged information. Whether this information was truly valuable and unique for purposes of a successful DTSA claim is likewise a factual issue unsuitable for resolution at the pleading stage.

Novartis and Dieringer also contest the secrecy element of Plaintiffs' DTSA claim. (Novartis Mem. at 16-17.) Yet "[c]ourts in this district have viewed as sufficient allegations as to a plaintiff's investment of resource, both in developing its alleged trade secrets and maintaining their secrecy, as well as allegations as to the value and competitive advantage of those secrets." SS&C Techs., 2024 WL 5186530, at *4 (internal quotation omitted). Plaintiffs have sufficiently alleged that password protection, employment agreement provisions, and non-disclosure agreement policies were employed to maintain the secrecy of documents containing the alleged trade secret information. (Am. Compl. ¶ 243.) Similar measures have been found sufficient to support allegations of secrecy for DTSA claims at the pleading stage. See, e.g., SS&C Techs., 2024 WL 5186530, at *7; Medidata Sols., Inc. v. Veeva Sys. Inc., No. 17-CV-589-LGS, 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018). Though Novartis and Dieringer suggest that Plaintiffs marketed this information and thus cannot benefit from trade secret protections (Novartis Mem. at 16), the Amended Complaint makes no mention of sharing the specific alleged trade secret information, as opposed to a broader "prospectus" or a "due diligence questionnaire" shared with prospective investors (Am. Compl. ¶ 89). Any contention that such documents, or any other disclosures, actually disclosed the supposedly secret information is better suited for determination at the summary judgment stage.

iii. Misappropriation Claim

Novartis and Dieringer challenge the sufficiency of Plaintiffs' pleading of the misappropriation element of their DTSA claim. The DTSA defines "misappropriation" as follows:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> (I) derived from or through a person who had used improper means to acquire the trade secret;
>
> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that—
>
> (I) the trade secret was a trade secret; and
>
> (II) knowledge of the trade secret had been acquired by accident or mistake . . . .

18 U.S.C. § 1839(5)(A)-(B). As relevant here, the DTSA prohibits two kinds of unauthorized disclosure or use: one in which the defendant "used improper means to acquire the secret" directly, and another in which the defendant "at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." Zebra Strategies, Inc. v. Gonzalez-Nazario, 764 F. Supp. 3d 144, 153 (S.D.N.Y. 2025) (quoting Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc., No. 15-CV-211-LGS, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016)). Novartis and Dieringer argue that Plaintiffs fail to allege that Defendants ever accessed the alleged trade secret information, let alone via improper means. (Novartis Mem. at 18-19.) Novartis and Dieringer further argue that Plaintiffs improperly assert a theory of secondary liability under the DTSA,

which the statute does not permit. (Id. at 19.) Plaintiffs respond that their allegations amount to both improper use and acquisition of Compass' trade secrets. (Pl. Mem. at 32.)

Plaintiffs have sufficiently alleged misappropriation. For the reasons discussed in the context of Plaintiffs' aiding and abetting a breach of fiduciary duty claim, "the Court sees no reason to believe that the . . . Defendants lacked knowledge of the improper means used to acquire and transmit the information." DFO Glob., 2021 WL 3475596, at *5 (regarding similar scheme to transmit confidential information from employees). Nascimento and Jones' transmission of an electronic data room link to Johnston and Dieringer giving access to the alleged trade secret information, while they were still employed by Plaintiffs and after Defendants had requested the information from Nascimento, supports plausibly the inference that Defendants knowingly accessed that information via improper means. At the pleading stage, "[a] plaintiff is required to 'plead facts sufficient to raise an inference that a defendant improperly used a trade secret, but need not specifically plead that the defendant used the trade secrets.'" SS&C Techs., 2024 WL 5186530, at *9 (quoting Balance Point Divorce Funding, LLC v. Scrantom, 978 F. Supp. 2d 341, 353 (S.D.N.Y. 2013)). Though Novartis and Dieringer aver that the Amended Complaint does not specify whether any Defendant actually opened the link, Plaintiffs allege that Johnston and Dieringer requested this information in preparation for the Side Letter. (See Am. Compl. ¶ 133-34.) Nascimento's transmittal of the information and the subsequent consummation of the Side Letter give rise to the plausible inference that Defendants acquired trade secret information via improper means.

Novartis and Dieringer's contention that this theory amounts to impermissible secondary liability under the DTSA is without merit. Plaintiffs' allegations of Defendants' conduct fall squarely within the statutory definition of misappropriation. The DTSA prohibits

both acquiring a trade secret when one "knows or has reason to know that the trade secret was acquired by improper means" as well as using "improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(A), (B)(i). "'Improper means' can involve . . . 'breach or inducement of a breach of a duty to maintain secrecy . . . .'" Hedgeye Risk Mgmt., LLC v. Dale, No. 21-CV-3687-ALC, 2023 WL 6386845, at *7 (S.D.N.Y. Sept. 29, 2023) (quoting AUA Priv. Equity Partners, LLC v. Soto, No. 17-CV-8035-GHW, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018)). By alleging that Defendants induced Nascimento to breach his fiduciary duty to maintain Compass' trade secrecy, Plaintiffs have sufficiently pled misappropriation under the DTSA.

* * * * *

Plaintiffs have sufficiently pled a timely claim that Defendants misappropriated trade secret information in violation of the DTSA. The Motions will therefore be denied insofar as they seek the dismissal of Plaintiffs' DTSA claim.

3. Unfair Competition Claim

Novartis and Dieringer, lastly, argue that Plaintiffs' unfair competition claim is deficient and duplicative. They first assert that, because Novartis was never Compass' competitor, an unfair competition claim may not be levied against them. (Novartis Mem. at 20.) They also argue that Plaintiffs' unfair competition claim is duplicative of the DTSA claim, thus requiring dismissal. (Novartis Mem. at 19-20.) For their part, Plaintiffs assert that direct competition is not required and that the DTSA and unfair competition claims may be pleaded as alternative claims. (Pl. Mem. at 35-37.)

Plaintiffs are correct on each point. First, New York courts have recognized that the "law of unfair competition is a broad and flexible doctrine" that allows such a claim to be

sustained "even if the parties are not actual competitors." PRCM Advisers, 2021 WL 2582132, at *17 (citation modified); see Nat'l Broad. Co., Inc. v. Sonneborn, 630 F. Supp. 524, 539 (D. Conn. 1985) (applying New York law to unfair competition claim based on plaintiff's principal place of business in New York and corresponding injury being "most acutely felt in New York"). Plaintiffs' allegations that Defendants "misappropriat[ed] [Plaintiffs'] intellectual property, employees, and know-how . . . . are sufficient to plead a claim for unfair competition." PRCM Advisers, 2021 WL 2582132, at *17.

Plaintiffs are also correct that the unfair competition claim may be pursued as an alternative to their DTSA claim. As highlighted above, the allegedly misappropriated information could amount to a trade secret under the DTSA. Even if the information is not a trade secret, Plaintiffs' unfair competition claim may remain viable. See Rokt Corp. v. AdsPostX, Inc., No. 23-CV-2081-LTS, 2025 WL 2711190, at *14 (S.D.N.Y. Sept. 23, 2025) ("[Plaintiff] is entitled to plead the unfair competition in the alternative to its trade secrets claim, in the event that any of the information underlying its trade secrets claim is ultimately found to constitute confidential information, but not actionable trade secret information.").[6]

---

[6] Novartis and Dieringer raise two other arguments across all claims — that Plaintiffs' allegations are not sufficiently particularized to satisfy under Rule 9(b) and that Plaintiffs have not adequately pled proximate causation. (Novartis Mem. at 9-13.) These arguments fall flat as well. For the reasons discussed in the context of each individual claim, Plaintiffs' allegations meet the heightened standard of Rule 9(b) even if it applies. Additionally, Novartis and Dieringer's argument on proximate causation amounts to another factual dispute with the allegations as pled. See In re Sept. 11 Prop. Damage & Bus. Loss Litig., 468 F. Supp. 2d 508, 531 (S.D.N.Y. 2006) ("[T]he issue of proximate cause is fact laden and inappropriate for a motion to dismiss at the pleadings stage."), aff'd sub nom. Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166 (2d Cir. 2013). Plaintiffs have sufficiently connected, at this pleading stage, the misappropriation of information and the breach of fiduciary duty with damages to Compass.

Novartis and Dieringer's remaining contentions regarding the unfair competition claim are unavailing in light of the Amended Complaint's sufficient pleading of the requisite elements of unfair competition. (See Am. Compl. ¶¶ 254-57.) Defendants briefly argue that Plaintiffs fail to allege bad faith or property interests (Novartis Mem. at 21), but the same reasons that allow the DTSA claim to withstand dismissal apply with equal force here. Additionally, the Amended Complaint sets out the details of Defendants' bad faith by virtue of the alleged conspiracy with Nascimento, Jones, and Jussen (Am. Compl. ¶ 255) and the proprietary consequences that followed (id. ¶¶ 256-57). Defendants also briefly raise a failure to plead special damages (Novartis Mem. at 22), but the Amended Complaint adequately sets out diversion of Compass' business, which satisfies this requirement at the pleading stage. See Conflict Int'l, Inc. v. Komorek, No. 23-CV-02165-ER, 2024 WL 1347577, at *15 (S.D.N.Y. Mar. 29, 2024) ("With all reasonable inferences drawn in Plaintiffs' favor, therefore, the complaint plausibly alleges that Defendants diverted business from Plaintiffs. That diversion of business is sufficient, at this stage, to allege special damages." (citations omitted)).

## III. CONCLUSION

For the reasons explained above, Defendants' motions to dismiss are denied in their entirety. This Memorandum Opinion and Order resolves docket entry nos. 42 and 45. This case remains referred to Magistrate Judge Gary Stein for general pretrial management.

SO ORDERED.

Dated: New York, New York
September 30, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge